Robertson, J.
—The capacity in which the Board of Auditors of the State of Michigan acted in passing upon the claim of the defendants against such State, having been fully discussed and settled in the former opinion of this Court at general term, when this case was before it on appeal, a re-examination of that question is rendered entirely unnecessary.
It was then held, that the proceedings and decisions of such Board “were as truly judicial in their nature as those of any special tribunal constituted by competent authority, to hear and decide controversies between adverse parties, not proceeding according to the course of the common law, or the mode usual in Courts of Chancery.” And it was further held, that a sum of money adjudged by such tribunal to be due upon a claim within its jurisdiction, submitted in good faith to it, in the manner prescribed by the law creating it, and paid by the State in pursuance of such adjudication, could “not be recovered back merely because the court in which a suit may be brought for the purpose, is of the opinion that such tribunal was clearly wrong in the conclusion to which it came, or because facts existed which, if proved, would have led to an adverse decision.”
But the decision of such Board of Auditors has been declared in the conclusions of law at special term in this case, to be null and void, on the ground that it was contrary to law, equity and good conscience, and procured by fraud practiced by the present defendants in their proceedings before such Board, in the prosecution of such claim, during the ignorance by the members of such Board, *50 and the plaintiffs, of certain facts now established, such ignorance being without fault or negligence on their part. Those conclusions do not state of what such fraud consisted, but another one states it to have been the duty of the defendants to have communicated to such Board, during the pendency of such claim before it, the fact of which it was so ignorant. The origin of that duty is not distinctly stated, but it must be inferred, if it existed at all, to have grown out of relations between the defendants and either the Board or the plaintiffs, so that the fraud may be assumed to have consisted of a breach of duty, in not disclosing facts within the knowledge of the defendants, to the Board or the plaintiffs, which the relations between them obligated the former to make known. There does not seem to have been any active fraud charged, unless the written statement to such Board by the defendants’ counsel, that the defences stated by him were all he had “ ever heard hinted at ” “ and that the defendants had never been paid,” is to be considered as such. Those allegations, and the omission by both such counsel and the defendants to notify such Board of .the occurrence of certain facts, are found by the court at special term (as a fact,) to have been made in the full belief, that if the actual facts, or such notice as was sufficient to lead to inquiry, had come to the knowledge of the Board, the claim would have been rejected. Among the facts so suppressed,, however, was the countermand of a draft, which was not found by the court at special term to have' been one of those which it was the duty of the defendants to have disclosed, and whose omission therefore became part of the fraud. So too, as a receipt by either the defendants or their assignors, of any part of the moneys received upon certain settlements, was not found to be any of the facts so suppressed, which it was the duty of the defendants to have disclosed, it will hardly be claimed, that their counsel’s allegation that they had not been paid anything, constituted any part of such fraud. So that the fraud is finally reduced to an omission to state to such Board facts now established, which it was held as matter of law that it was the duty of *51 these defendants to have communicated to the Board of State Auditors. The question of negligence on the part of the plaintiffs, in ascertaining the omitted facts, seems also to have entered somewhat into the decision at special term; but although certain facts are established in this case, tending to prove notice at least sufficient to have put the plaintiffs upon inquiry after such omitted facts, no conclusion of law is stated, whether such evidential facts did or did not operate as a notice of that kind; and this is the more remarkable, as the opinion given at the time of the former judgment at general term, holds that the "State and its officers were notified of at least one of those facts, to wit, certain settlements, and that the notification of it to such Board would have led to an inquiry, which must have resulted in a disclosure of all the other facts now established. I am induced, therefore, to think that the judgment at special term was given upon the assumption, that previous notice to the State of Michigan of facts sufficient to put 'her upon inquiry if she had been a private individual, and to have enabled her to follow up such inquiry to ultimate knowledge, ought not to disturb it.
I think, therefore, the question is plainly presented, whether there were any such relations between the defendants and plaintiffs, as to have made it the duty of the former to have presented, if known to them, every omitted fact to the Board, which could operate in favor of the latter, because if there were, it is now urged, that any want of candor in that respect was the practice of a fraud upon the Board itself even as a judicial' tribunal. It is not claimed that such suppression was accomplished by hoodwinking the present plaintiffs; by preventing them by false representations .from appearing before such Board, or being-heard or presenting testimony; no undue advantage in the form or manner of investigation is pretended, and the final decision is admitted to be free from partiality or any undue influence. The fraud is claimed to have been perpetrated upon the tribunal itself, by the violation of a supposed obligation to disclose everything known to the defendants, *52 or of the undertaking of the defendants’ counsel to enumerate every defense that he had heard hinted at. No ground or source of such obligation has been suggested except the general moral duty of fairness. It is not pretended to arise out of any relation between a tribunal and suitors before it, and it would be difficult to suggest how a court could be so interested in the result of a case to be adjudicated by it, as to entitle it to take legal proceedings to set aside its own judgment or deprive either party of its fruits, because such party had withheld facts material to a decision of the case abstractly just; because clearly the party imposed upon must be the same party as that which has a right to relief; it is not said that the adverse party has a right to the disclosure, but the court, and of course as a court. Now the only case in which such a principle has prevailed is that of infants, where the court acts rather as a guardian making an agreement in their behalf, than an impartial tribunal. (Wright v. Miller, 1 Sandf. S. C. 119; Shedden v. Patrick, 28 Eng. L. & Eq; R. 56; Loomer v. Wheelwright, 3 Sandf. Ch. R. 159.) In Bateman v. Willoe, (1 Sch. & Lef. 209,) Ld. Redesdale well observes, that owing to the inattention of parties and other causes, exact justice can seldom be done, and if it could, it is more important to put an end to litigation; and in the same case he adds, that a court of equity cannot enter upon matters once investigated, according to the ordinary rules established by the legislature and courts. Courts can only decide upon allegations and proofs, and the annulling of their decisions because somebody ought to have brought something to their notice not previously known to them, would let in a flood of collateral litigation, and make a collateral suit more effective than an appeal, introducing into it the additional issue of knowledge by the successful party, and the judge of the withheld facts, and perhaps also want of knowledge by the former of the ignorance of the latter.
Nor can this duty spring from the official position of the members of the Board in this case, or its mode of proceeding, the evidence upon which they had a right to act, or *53 the want of opportunity to the plaintiffs to be heard. As far as the official position of the members was concerned the defendants had most cause to complain, as they did not select one (exparte Rogers, 7 Cow. 526.) There might also be some weight in the principle, if the Board were required to guard the State's rights and act as a judge advocate; but they are only required to notify the attorney general, whose express duty it was by a State law to attend and represent the State. If exparte affidavits could have been received, and there were no means of compelling the attendance and answers of witnesses, there would be more room for scrutinizing the representations of the successful party; but in this Board the attendance of witnesses and the examination of the claimant under oath could have been compelled. If they had been obliged to dispose of the case secretly and at a single meeting it might bear on the question of fraud, but they were entitled to adjourn from time to time, as they pleased, nor could they dispose of the claim, unless with an open record of the testimony upon which they acted. And finally the ordinary force of a hostile judgment was given to their award by the compulsory remedy to which the claimant was entitled for the amount awarded to him. (See Kendall v. United States, 12 Pet. 616, 642.) I therefore am unable to find anything in either the composition of the court, the mode of its proceeding, the materials of its judgment, or the character of its decisions, to make the last an exception from the sacredness and conclusiveness which attend those of all other judicial tribunals. Would a duty be imposed upon State officers to suggest every fact favorable to a claimant, when the State was seeking to make an offset against the claimant's demand ? and if by reason of such suppression by such officers, a just demand of the claimant was diminished by an unjust set-off, would the betrayed claimant have any remedy ? Equitable rules must be wretchedly partial that do not extend equal justice to both sides; and to use the language of Lord Coke, “the State, sovereign as she is, has descended into a common *54 arena, she is entitled to no advantage over an adversary, because her own officers keep the lists.”
Prior knowledge by the State of the suppressed facts should certainly discharge the defendants from any obligation to take charge of the case of the former before the Auditors, and communicate such facts to them, and if so, information of facts leading directly to such knowledge, ought at least to relieve the defendants from a charge of fraudulent suppression. But the difficulty in this' case is that neither ignorance nor knowledge, nor notice leading to knowledge, is among the facts found at special term, except by implication from the conclusion of law, which makes such ignorance good cause for setting aside the decision of the Board, but implying that it was only so because not culpable. We are, therefore, still in the dark, as to how far knowledge .by any or all of the officers of the State, or communications filed among its archives, or in the various departments, were sufficient in law to require the pursuit of the clue thus afforded, before relieving the State from culpability in not communicating to its own Board of State officers all the information it possessed. This obscurity is the more marked from the fact that the defendants, although equally' an artificial person with the plaintiffs, are assumed to be chargeable with notice of all the acts of their agents, all the knowledge of their officers, and by assignment, with all the like notice and knowledge of the agents and officers of their assignors, another artificial body. It is possible a State may be only chargeable with notice by positive enactment or through some special one or more State officers, but that principle is not involved in the decision at special term, so far as can be gathered from the findings of fact and conclusions of law. I do not believe it was intended to be o^ could so have been held, because the opinion which accompanies the judgment at special term, holds that information of certain settlements, “ if brought home to .the Board, would naturally lead to the inquiry as to what had been done with the property■ received from” the «two banks, and that “it was just to conclude, *55 that such inquiry would have resulted in the disclosure ” of certain acts of the defendants, which are the very facts of whose suppression the complaint is made. And it further, after alleging “that the State was notified and reminded, year after year, of the facts and terms of such settlements, by a communication thereof made to several State officers, and to its legislature, when the claim was presented to that body,” held that “A mere omission to recall the fact of those settlements to the attention of the Board, would not on such a state of facts be of itself a sufficient cause for adjudging the decision of such Board to be a nullity.” If therefore the settlements were known to the State, and such knowledge would naturally lead to the inquiry as to what had become of the property "received on such settlement, and such inquiry would lead to the discovery of the facts whose suppression is complained of; the defendants are not to be blamed.
The language of that opinion is fully borne out by the facts of the case. The compromise by the defendants of claims which they held as security for the debt due from the State, and the trustee who held new securities in trust for both parties, was perfectly known to every officer of the State and every branch of the State government; the disposition of the securities held by such trustee, and his discharge from liability, could have been easily ascertained. The Auditor General knew of the compromise in 1840, and sanctioned it; it was communicated to the legislature of the State in 1841, and for four successive years afterwards. In that year, and in 1848, it was brought to the notice of the Auditor General; in 1840, and two following years, the Attorney General was appealed to; with such reiterated information the State could not complain that she did not know of the compromise and its terms, which leaves her simply ignorant of the exchange of securities and final discharge of the trustee. Those securities were the property of the State, if she owed and paid the original debt of the defendants, pledged for the payment of that debt; if she had been a private individual it certainly *56 would have been an act of ordinary prudence to have ascertained whether anything had been realized from them, and to have demanded their restoration before paying- the debt. Mankind' would think but little of the caution of a person who should neglect to do so, and courts would be apt to assume that the omission to inquire was proof of knowledg-e what moneys had been collected on such securities; he . certainly could not recover back what he had overpaid', upon the ground of a fraudulent suppression by the creditor of the collection of moneys as a fact which it was his duty to disclose. The discovery by the present Attorney General of the State, of facts sufficient to enable him to make the demand, as early as May, 1855, shows the ability of the plaintiffs, with proper diligence, to have ascertained the suppressed facts. It seems to me, therefore, that the State is chargeable with knowledge of the facts which she might have ascertained, and that the facts previously communicated to her were enough to put her upon inquiry;, that the defendants had a right.to assume, 'that if the plaintiffs failed to present them before the Board of Auditors, it was from a. belief that they were immaterial, and that they themselves were at least guilty of no fraud, even if otherwise bound to make mention of such facts to such Board, when thus justified in believing that the State possessed knowledge or means of knowledge of such facts, and failed to disclose or use them as a defense to their claim.
But no authority sustains the doctrine of a deceit practiced upon the court as" distinct from that practiced upon an opponent; the learned counsel for the plaintiffs has failed to produce any approaching such a principle, and my own research has furnished me with none. There are, it is true, cases of active fraud practiced upon the adverse litigant or third persons, but they are of a positive kind or a violation of a previous duty, arising from the relation of the parties, existing or created for the occasion, and not a word is s.aid in any of them of duty to the court; such are the cases of Gifford v. Thorn, (1 Stockt. 702;) Stevens v. Guppy, (1 Turn. & R. 178;) Dobson v. Pearce, (2 Kern. 157;) *57 Fermor’s case, (3 Rep. 77,) and Reigal v. Wood, (1 John. Ch. R. 402.) Even in the only case in which the duties of a court most resemble those of a guardian for the State, to wit: the naturalization of aliens; fraud in the allegations upon which an applicant is admitted to citizenship, is no ground for assailing the judgment collaterally. (McCarthy v. Marsh, 1 Seld. 263.)
Any other doctrine would lead in any case to interminable litigation; the same constructive frauds might arise in every new collateral trial of the judgment in the case previously decided, and the controversy could only be ended by exhaustion of the patience or purse of the combatants.
Courts of equity have, however, in one class of cases, relieved parties from the burden of satisfying decrees or claims against conscience, when obtained without their fault, by an inevitable accident. Those are where since the trial upon which such decree was rendered the failing party has discovered both facts and their evidence, which by no diligence he could have obtained before, and whose existence make the claim unconscionable. (Adams’ Doct. of Eq. 197, point 3 and cases cited in Eng. note e and Am. note 1.) Courts of law could always grant new trials for newly discovered evidence merely, when not cumulative, if the application was made in a reasonable time, but when courts of equity interfered they required the facts themselves to be both newly discovered, and such as could not have been found by examining witnesses; thus the finding of a receipt as evidence of payment, or the discovery of facts which the cross-examination of a witness would have disclosed was not a ground for relief. (Taylor v. Sheppard, 1 Yo. & Col. Ex. R. 271.) The same principle would apply to a failure to examine witnesses known to be familiar with all the acts relating to a particular transaction. In this case, neither Messrs. Stewart, Lothrop, Delafield, Tileston, nor any other officer of the defendants, or the former Phoenix Bank, was examined by the plaintiffs before the Board of Auditors, or was applied to for information, although no *58 difficulty was found in examining them in this action. A very natural course of inquiry suggested by the knowledge of the original settlements derived from their repeated notification to the State officers, would have reached all the facts now claimed to have been suppressed. Stewart knew the whole transaction; Lothrop could have been compelled to disclose what other defenses had been hinted at besides those met by him; the two presidents of the old and .new Phoenix Bank could have been required to tell1 every fact within their knowledge, and their correspondence could have been reached and exposed; can the omission to examine any of1 them be justified ? No respectable counsel, possessed of such knowledge as the officers of this State had, both as to facts and those who knew them, could, if he had any regard for his reputation, venture to justify the loss of his cause by the excuse that he never thought of inquiring of such witnesses, as those just mentioned, what had become of the securities taken on so well known a settlement.
But in fact the complaint lays no foundation for the interposition of such an equitable jurisdiction or even for relief founded upon any inability of the plaintiffs to have discovered, by due diligence, all the necessary facts, or the absence of such notice to them of facts, sufficient to have put them upon inquiry leading to the discovery of such ulterior and more material facts. It does indeed aver ignorance of them, but that, if the result of wilfulness or negligence, is not sufficient. ■ The whole foundation of the claim is the ignorance of the Board of Auditors, not the State, and fraudulent concealment by the defendants from them of facts which they were entitled to know, and these would remain the same, if the State had possessed all the knowledge of the defendants, unless its officers communicated it to the Board. Tet it seems to have struck the mind of the" framer, of such complaint, that some duty of inquiry was" incumbent on the State and its officers, as the removal of Mr. Stewart from Michigan is given as an excuse for not examining him, and the ignorance by the plaintiffs, both of facts claimed to be material, and circumstances leading to *59 their knowledge, is given as a reason for not availing themselves of them before such Board. The answer too, suggests the name of another who might well be supposed to know something of the matter, who was not examined, to wit: the Attorney General of the 'State, when the claim was before the Board. So that the pleadings themselves are defective, if the obligation of the plaintiffs to inquire and consequent ability to discover the facts, which they allege would have constituted a defense to the defendants’ claim, were such as to have removed the responsibility of •disclosing them from the shoulders of the latter to their own.
But in every aspect of this case, it is essential to any ground upon which „relief could be sought, that the claim of the defendants, to retain the fruits of the decision of the Board of Auditors, is against conscience; not merely against the rules of the common or statute law of any or all States or countries, or of courts of equity, but one which shocks the moral sense; one which, if sustained by arbitrators, with all the facts before them now before this court, would leave room for no other inference but partiality or corruption; for upon such ground alone have we a right to infer that the Board of Auditors would have made a different decision had they known all such facts, as they have not stated what rules they adopted, and they were entitled to use the widest discretion; and equity equally requires similar injustice in asserting a claim to retain moneys paid according to a decision of a judicial tribunal. It is true it is difficult to define with great precision what is a claim against conscience, it is much easier to describe a claim without any foundation, or one which has been discharged or waived or otherwise terminated. In this case, the want of conscience, of which complaint is made, is not in the original claim, for the Board of Auditors passed upon that, with full knowledge of all the material facts bearing upon it. The countermand of one of the drafts has not been found in this case by the court at special term to have been one of the facts which it was the *60 duty of the defendants to communicate to the Board of Auditors, although the omission to disclose it is found to have been designed by the defendants to mislead such Board, and to have been made in the full belief that if the actual facts of the case came to the knowledge of such Board the defendants’ claim would have been disallowed; but it is not stated what effect such omission had upon the actual decision, without which a mere design or belief is immaterial. But even if it had been known it ought not to have altered such decision, for such countermand was not issued until thirteen days after the draft had been transferred, a time within which it ought to have been presented, at the hazard of the party taking it, a ground which was urged in the argument of Mr. Lothrop addressed to the Board, nor has it ever been pretended that such countermand was the cause of the non-payment of the draft. Besides the draft itself was in equity an assignment of the fund upon-which it was drawn, (Mandeville v. Welch, 5 Wheat. 277,) at least to the extent of justifying the -holder of it in paying it over to the person in whose favor the draft was drawn. The want of conscience in the defendants’ retention of the money received by them is mainly claimed to be evinced in doing so notwithstanding their settlement with the two banks on which the drafts, which were the origin of the claim, were drawn; the exchange of some of the securities taken on such settlement for others, the collection of moneys on such securities, the discharge of such banks and the agent who collected such moneys without any payment by him; and it is urged that by such acts the defendants took the banks in question as their debtors, in place of the State, and discharged them. It does not appear in evidence, nor is it alleged in the pleadings, nor has it been found as a fact, that by any consent of the State such banks are substituted as debtors in her place; although if Norton was her fiscal agent, she became the creditor of such banks by virtue of the drafts drawn upon them and their promise to pay them; or at least the Board of Auditors must have so held in order to justify their *61 allowance of the claim at all. The State was a debtor by-virtue of the money advanced, but one that without its own legislation could not be coerced into payment. Two banks were debtor to it for the same amount, and the defendants undertook to get from them and save as much as they could do for themselves or the State of the indebtedness of such banks; it was made part of the condition of the compromise by the latter in giving securities in discharge of their liabilities, that they should be released, and the defendants acting according to their best discretion for the interest of all concerned released them; they announced to the Auditor General of the State their intention of acting as trustee for the State in case the latter paid the debt; they never repudiated the State as a debtor, and looked to the banks as their only debtors, but only took them conditionally as debtors, in case the State would not recognize its indebtedness; I do not find in this any thing against conscience. The State which placed the defendants in the embarrassing. condition of losing the means of receiving part of their claim from persons whose responsibility was doubtful, for the sake of retaining a claim against a debtor who could not be coerced, cannot conscientiously claim that acts then done by the defendants to save what could be saved from such doubtful debtors, should be considered a bar to the claim against themselves although it might be so legally. The defendants by means of the decision in their favor by the Board of Auditors, are placed precisely in the position where they should have been.if their claim had originally been a just one; the State has allowed their full claim and thereby ratified their acts as agents for them in making settlements with the banks; or if not, their claim is still good against those banks upon the drafts in question; .or if they have lost it by lapse of time, the fault lies at their own door. None of the acts of the defendants have barred the plaintiffs from any rights. Mr. Stewart became avowedly trustee for the plaintiffs in case they allowed the defendants’ claim; his conveyance to the defendants was avowedly as such trustee, *62 and they could not release him as such trustee so as to bar the plaintiffs^ claim, as ■ cestuis que trust, to whatever property held by the defendants as assignee of such trustee the plaintiffs may be entitled, upon filing a proper complaint for the purpose. I therefore cannot find in this conduct of' the defendants such a discharge of the debt, and repudiation of the plaintiffs as the original debtor, as to make the defense one so against conscience as to entitle the plaintiffs to be let in to litigate anew the merits of the defendants’ original claiip.
Enough has been said, perhaps, to dispose of the merits of this case, but I cannot let the opportunity pass without endeavoring to rescue from unjust obloquy the reputation of an innocent third party, whose acts or declarations as agent of the defendants have been claimed to be the acme of fraudulent dealing. The counsel for them (Mr. Lothrop), in the course of his written argument presented to the Board of Auditors, says : “I proceed to inquire whether there are any defenses to the claim. I" will fairly and fully state every defense that I have ever heard hinted at,” and then proceeds to combat three, which do not include that now set up. I do not see how this declaration from an advocate before a judicial tribunal can be tortured into such a contract with the tribunal, to disclose all he knew, as to entitle the party prejudiced to maintain an action for its violation, or how he could bind his client to disclose all that such advocate knew. It would undoubtedly tend to the advancement of morality greatly if all men could be compelled to speak the exact unqualified, and uncojored truth; but other interests require that too nice investigations into it should be avoided. If every case were to be re-tried upon the ground of mis-statements or suppression of facts by counsel, which made against his client’s case, it is doubtful whether a case could ever be finished; for a tone, a shrug, a gesture, may say as much or more than words, and the evidence as to their interpretation or character would only add to the proofs of the fallibility of human testimony. But the counsel in this case did not undertake *63 to state all material facts, but only defenses. Is there any evidence that the facts now urged were presented to the counsel in question as a defense ? was he bound to know they were a defense ? There is no warrant for such a conclusion. The same counsel in the same argument, after stating that he has established certain other facts, enumerates as one, that “the defendants had never been repaid a dollar to this day.” The findings in this case which corresponds with such statement sustains it, even if it could be forced into a positive assertion instead of inference.
Upon the whole, therefore, I have come to the following conclusions : That the Board of Auditors acted as and had all the powers of every specially constituted judicial tribunal ; that there was no special obligation of the defendants to disclose to it facts favorable to the plaintiffs’ case, of which its members were ignorant; that if the imposition of such duty depended upon ignorance by the plaintiffs of facts material to their case, such ignorance could not have that effect, when it was rendered incumbent on the plaintiffs to acquire knowledge of such facts, by notice to them of facts sufficient to put them upon an inquiry leading to such knowledge; that knowledge and proof of any facts material to the plaintiffs’ case now set up could have been obtained by the examination of witnesses before such Board, whom the plaintiffs had every reason to believe knew them, and by the exercise of due diligence; that newly discovered evidence of such facts is not sufficient unless the facts themselves have only been recently discovered, notwithstanding the exercise of due diligence to learn them; that it is not against conscience for the defendants to claim to retain the moneys paid them according to the decision of such tribunal, notwithstanding the facts proved in this action; that the counsel of the defendants did not contract any obligation to such tribunal to disclose any matters prejudicial to the defendants; had not authority to do so, and could not so contract.
As the result of such conclusions, I can only hold that the decision of the Board of Auditors was binding—that the *64 judgment at special term should he reversed and a new trial ordered with costs to abide the event.
Pierrepont, J.
—Two questions are presented for our consideration upon this appeal:
First. Was the Board of State Auditors of the State of Michigan a judicial tribunal, whose decisions were binding upon a claim within their jurisdiction, in the same manner as the decisions of a special court constituted by competent authority ?
Second. Can the money which the Phoenix Bank obtained from the State of Michigan, through the award of such tribunal, be recovered back in this action on account of any fraud which the case discloses ?
The first is not an open question. When this cause was before the court on the first appeal, the general term, through the chief justice, expressed its views as follows :
(Here follows the opinion, which will be found in 4th Bosw. R. 363.)
His opinion then proceeds as follows :
We consider this question then not only decided in this court, but decided in accordance with the law as previously settled.
I next proceed to consider-the question of fraud. And first, as to the justice and validity of the original claim of the Phoenix Bank against the State of Michigan; it is to be remarked, that this has already been adjudicated, and that the decision was in favor of the claim. The claim was presented to the Board of State Auditors, a tribunal which the State had created, and in which it consented to be sued. All the facts touching the justice of the original claim were before that Board, none of them were suppressed —none of them were falsified; and with full knowledge, the Board decided in favor of the claim, and it was, in accordance with that decision, paid by the State. That judgment of the Board of State Auditors has never been reversed, impeached or set aside, and there is no evidence before us that the Board of Auditors has . ever changed its mind as *65 to the justice of the original claim of the bank against the State. The validity of the original claim then is not open for our consideration. That has been settled by a competent tribunal of the State of Michigan.
The remaining and important inquiry is, when the alleged fraud commenced, and in what did it consist ?
The original claim of the bank has been adjudged valid and just against the-State of Michigan; no part of it was ever paid to the bank by the State, until after the decision of the Board of Auditors, when it was all paid; and this payment the State now seeks to recover back. Except this payment by the State, the bank have never received any money for their claim : this is found as a fact and supported by the evidence.
The claim of the Phoenix Bank had its origin as follows: S. T. Mason, governor of the State of Michigan, had deposited with Mr. John Delafield, president of the Phoenix Bank, a large amount of bonds of the State of Michigan to be negotiated for the benefit of the State. While the bonds remained in Mr. Delafield’s hands Governor Mason wrote as follows :
“Detroit, Feb. 24, 1838.
“Dear Sir—In a conversation with Mr. Norton, the ■ evening before his departure, he suggested that he would like, in addition to his $90,000 due on my draft, to command some additional funds to purchase and redeem Michigan notes in your market. Mr. Norton is a particular personal friend of mine, and is the fiscal agent of the State, and cashier of the State Deposit Bank. Tou may, therefore, if you have received funds on the bonds in your possession, transfer to Mr. Norton $50,000 (or) $100,000, taking his certificate of deposit from ‘John Norton, Jr., cashier of the Michigan State Bank,’ which will Jie cashed at the State Deposit Bank. This letter is enclosed to Mr. Norton, who will deliver it to you.
“ Respectfully, S. T. MASON.
“John Delafield, Esq.”
*66 On receipt of Governor Mason’s letter, Mr. Ogden, cashier of the Phoenix Bank, sent to Mr. Norton, cashier of the Michigan State Bank, the following, viz :
“ Phoenix Bank, ) “New York, 13í/¿ March, 1838. )
“ J. Norton, Esq., Cashier :
“Dear Sir—Please receive herein my draft on Farmers’
and Mechanics’ Bank, Detroit.............. $8,500
do. Bank of River Raisin, Monroe...... 7,900
$16,400
“ On account of advance made by this bank on Michigan bonds, deposited with John Delafield, Esq., president.
“ Respectfully, yours,
“N. G. OGDEN.
“ Received of the Phoenix Bank the above letter.
“ John Norton, Jr., Cashier.”
These two drafts, amounting to $16,400, are the foundation of the original claim of the Phoenix Bank against the State of Michigan. When these drafts were delivered to Norton, Mr. Delafield had not received any money on the bonds entrusted to him by the governor ; and this advance of $16,400 was charged on the books of the Phoenix Bank to “ J. Delafield, agent for the State of Michigan.” Subsequently, Governor Mason, for the sake of completing other arrangements for raising money for the State, sent the following note to Mr. Delafield, viz :
“ Morris Canal Office, )
New York, June 4, 1838. )
“ John Delafield, Esq.:
“ Sir—You will deliver to Theodore Romeyn, Esq., the whole amount of Michigan bonds in your possession, (say twelve hundred thousand dollars at 6 per cent, stock.) Mr. Romeyn will hand you the amount of Prime, Ward & King’s charge, and account, for advances to the State.
“ Respectfully, your ob’t servt.,
STEVENS T. MASON.”
*67 Mr. Delafield, at this time, requested that the $16,400, alleged to have been advanced, on behalf of the -State of Michigan, to Norton, on the 13th of March, 1838, should also be then refunded.
Governor Mason, in answer to this request and claim, wrote a note to said Delafield, in the words following, viz.:
“New Yc-rk, June 4, 1838.
“ Sir—John Norton, Esq., having received from you two drafts, one on the Farmers’ and Mechanics’ Bank, of Detroit, for $8,500, and the other on the River Raisin Bank, for $7,900; in adjusting our accounts it becomes important to state, that when I left home, according to my impression, those drafts were not collected, but so soon as I learn that such is the case, I will cause the amount to be remitted to you.
“Yours, respectfully,
“S. T. MASON.
“John Delafield, Esq.”
Upon the receipt of said last letter, Mr. Delafield surrendered all of the said State bonds held by him as such agent as aforesaid, and Governor Mason then gave a receipt therefor, reading thus:
“Received, New York, June 4, 1838, of John Delafield, Esq., the entire amount of Michigan State bonds, heretofore placed in his hands as agent.
“S. T. MASON.”
It is found as a matter of fact that “ when the two drafts (viz., one for $8,500, and one for $7,900) were delivered by the Phoenix Bank to Norteñas aforesaid, the Phoenix Bank and Delafield believed that the advance would be recognized and treated by Governor Mason as an advance made to the State of Michigan, and made said advance in actual good faith, believing that said Norton would pay to said State and on its behalf, the sum so advanced, and would be expected and required by Governor Mason so to do.
That “the cashier of the Phoenix Bank, by letters addressed to Governor Mason—one dated November 20, 1838; one dated March 22, 1839; one dated May 13, *68 1839 ; one dated the 15th day of July, 1839—urged him to give his attention to the matter of these two drafts, amounting to $16,400, and to remit the amount of said alleged advance and interest to- said Phoenix Bank. No reply was made to those letters, except that an interview took place between Governor Mason and Mr. Ogden, between the 15th day of May and the 15th day of July, 1839; of what was said in that interview there is no direct evidence, except that the said letter of July 15th, 1839, affirms that Governor Mason gave Mr. Ogden to understand, that the matter should receive the immediate attention of Governor Mason on his return to Detroit.
That “ the said $8,500 draft was collected by Norton or the said Michigan State Bank, and the amount thereof was credited on the books of the latter to the Phoenix Bank, on or about the 26th of October, 1838.
That “ the draft for $1,900 was never paid to Norton by the River Raisin Bank, and the Phoenix Bank on ascertaining that fact, by a letter of its cashier, dated March 26, 1840, addressed to the cashier of the River Raisin Bank, (and received by the latter on the 2d, 3d, or said 4th of April, 1840,) said •:
“If it—the draft for $1,900—has not been paid by you, you will please refuse payment of it, as we have never received value for it; and if not actually paid, prior to this notice, we shall look to you for the amount.”
That “on the 10th of June, 1840, the said Phoenix Bank employed Charles H. Stewart, Esq., a counsellorat-law, residing at Detroit aforesaid, to take charge of and present the claim of said bank against the State of Michigan, for the said $16,400, and the interest thereon, and authorized him to take all such measures as he might find expedient for procuring or securing payment thereof. Such employment was evidenced by a letter of that date, from the cashier of said bank to said Stewart, and by his written acceptance thereof, which letter”and acceptance read as follows :
*69 ‘New York, June 10, 1840.
‘ To Charles H. Stewart :
‘ Sir—You are authorized as agent for the Phoenix Bank, to' present to the State of Michigan, for payment, the claim of the bank for $16,400, advanced on the faith of the State bonds, in. March, 1838, to John Norton, as their agent, together with interest on the advance, and you will take all such measures as you may find expedient for procuring or securing the payment. You are also authorized to avail yourself of any proposition which may be made from any other quarter than the State, of securing the debt, or any part of' it, provided that you do no act to release or weaken our claim on the State, who is our proper debtor. You may exercise your own discretion in compounding for the interest, and in taking any security offered by the State, and we agree to pay you for your services ten per cent, on the sum you shall recover or secure for us, provided, however, that if you fail altogether you shall have no charge whatever against us. We will furnish any evidence within our power on demand, and shall do no act to nullify your proceedings.
‘ N. G. OGDEN, Cashier.’
‘ I agree to the terms above mentioned, and shall use my best efforts to advocate the claim of the bank.
‘ CHARLES H. STEWART.’
That “said Stewart, as such'agent, submitted said claim to the then Auditor General of the State of Michigan, prior to the 29th of July, 1840. The said Michigan State Bank and the said River Raisin Bank, were then in a precarious condition, and their failure was regarded as highly probable ; that said Stewart, and the said Auditor General deemed it for the interest of the said Phoenix Bank, and of the State of Michigan, if the latter should be held liable for, or should assume to refund the advance so as aforesaid made to said Norton, that settlements should be made with such banks by accepting from them the best securities they could be induced to give; to become eventually the pro *70 perty of the Phoenix Bank, or of the State of Michigan, as the latter should or should not, admit its liability to the Phoenix Bank and pay their said claim.”
That “in.order to furnish written evidence of this concurrence of views, and of the terms on which the said Auditor General assented to such a settlement and arrangement being made with said two banks, the said Stewart addressed to said Auditor General, on the 29th of July, 1840, a letter in these words, viz.:
‘Detroit, July 29, 1840.
‘ Hon. E. P. Hastings :
‘ Sir—I have submitted to you a claim made by the Phoenix Bank of New* York, .on the State, for $16,400, being for that amount advanced on the faith of the State bonds: the advance was made by drafts on the Farmers’ and Mechanics’ Bank and Bank of the River Raisin handed to John Norton as fiscal agent. The draft on the first bank was received and placed to the credit of the Phoenix Bank by the Michigan State Bank, and that institution and the River Raisin Bank now admit their indebtedness and offer security. The debt belongs either to the State or the Phoenix Bank, and the fact will be determined according to the view the next Legislature may take of the subject. You have no immediate power to settle the question, but your office makes you guardian and trustee of the State interests. I therefore submit to you whether it be not expedient to take such security as can be obtained for the benefit of the party ultimately entitled. It may not hereafter be forthcoming, and that such acceptance shall not be deemed to prejudice, or in any manner affect the ultimate settlement between the State and the Phoenix Bank, which shall be made as if no such security had been taken, and that I be at liberty to accept such security as in my judgment is the best to be had; and shall hold the same as trustee, transferring it to the State, in case they recognize their indebtedness, if not, then to the Phoenix Bank; and that *71 I also shall be at liberty to compound the question of interest with the banks, and any settlement with them be in full discharge of their indebtedness.-11 am, sir,
‘Your most ob’t serv’t,
‘ CHARLES H. STEWART.’ ”
That “said Auditor General, on the 22d of September, 1840, wrote at the foot of said letter of the 29th of July, 1840, as follows, viz.:
‘ Concurring in the views above suggested, I agree to the proposal suggested, but under the express understanding that by so doing I do not in any manner recognize the claim nor give it any validity or effect against the State more than it now has.
‘E. P. HASTINGS,
‘ Auditor General.’ ”
And then returned said letter to said Stewart.
That “ said Stewart, on the 23d of September, 1840, settled with said River Raisin Bank, and on the 2d of October, 1840, with said Michigan State Bank, as hereinafter stated, having no authority from the Phoenix Bank to make such settlement, except such as is conferred by said letter of June 10, 1840, and by a letter dated August 4, 1840, which last said letter reads thus, viz :
‘ Phoenix Bank, ?
‘New York, 4th August, 1840. )
‘ Charles H. Stewart, Esq., Detroit:
‘Dear Sir—I have your favor of the 19th ult. You are hereby authorized to adopt all or any such measures with regard to our claim on the State of Michigan, as in your judgment shall seem right and proper, and best calculated for the security and ultimate recovery of the same.
‘ My letter of instruction of 10th June last, was, as construed by you, intended to confer all those powers upon you as the sole agent for the bank in this matter.
‘Respectfully, yours,
‘ N. G. OGDEN, Cashier.’ ”
*72 That “ on the 23cl of September, 1840, said Stewart settled with the said River Raisin Bank, and at that time exhibited and left with it, as his authority for making such •settlement, the said letter of August 4, 1840, and on and as such settlement, received the items of property next mentioned, and gave a receipt written under a description thereof as follows, viz.:
‘H. D. Mason, bond and mortgage, judgment
March 23d, 1840 .................... $3,680 37
Six months’interest, to September 23, 1840____ 110 25
H. Phillips’ judgment, July 22, 1839 ......... 1,279 26
One year, two months, one days’ interest, to
September 23, 1840...................... 87 74
Levi Beebe, note due September 17, 1838...... 2,800 00
Two years and six days’ interest, to September
23,1840...................:............" 395 00
Draft on the Michigan State Bank ........... 155 53
Balance due Phoenix Bank.........$7,899 55
Interest from 16th August, 1839, one year, one month, seven days, to 23d
September, 1840................ 610 60
———. $8,510 15
1 Received, September 23,1840, of the Bank of River Raisin, eight thousand five hundred and ten dollars and fifteen cents, as above, in full payment of their indebtedness to the Phoenix Bank of New York, for moneys collected on their account.
‘ CHARLES H. STEWART,
1 Attorney and Agent for the Phoenix Bank.’ ”
That “ he also exhibited to such bank, prior to said settlement, the said letter of June 10,1840, and said bank not deeming that a sufficient authority for said Stewart to act in behalf of the Phoenix Bank, in making such settlement, the said letter of August 4, 1840, was procured, presented to, and left with said River Raisin Bank, as aforesaid.” “On the 2d of October, 1840, the said Stewart settled *73 with, the Michigan State Bank, and thereupon executed a paper, (showing the terms of such settlement,) as follows: 1 The Michigan State Bank, Detroit:
To the Phoenix Bank, N. Y. Dr.
1838, March 13.
For our draft on the Farmers’ and Mechanics’
Bank, Detroit, of this date................. $8,500 00 Interest on above compromised by agreement „ _ 500 00 Draft on River Raisin Bank on you, in favor of Charles H. Stewart, our agent.............. 155 53 $9,155 53 Or By Illinois and Michigan canal scrip _ _........ $500 00 By conveyance of 2,397-I46°o- acres of land in Saginaw county, by agreement in full........... 8,655 53 $9,155 53
1 Received the above in full discharge of the foregoing account.
‘CHARLES H. STEWART,
‘ Att’y and agent for the Phoenix Bank, N. Y.
‘Detroit, Oct. 2, 1840.’ ”
That “the said Michigan State Bank executed to said Stewart a deed, (as party of the first part thereto,) dated October 2, 1840, for the consideration (as expressed therein,) of $8,500, and also of $155, by which it conveyed to said Stewart the said two thousand three hundred and ninety-seven acres and forty one-hundredths of an acre of land (2,397-^j-,) ‘ subject, however, to the taxes and charges now (then) due and assessed upon said lands, and in trust for the Phoenix Bank of the city of New York, or.-for the Auditor General of the State of Michigan, whichever shall assume the debt thereby, settled by the party of the first part,’ the said Michigan State Bank. This deed was recorded on the 6th of October, 1840, in the proper county. *74 When this settlement was concluded, said Stewart informed the said Auditor General’ of the terms of the settlement so as aforesaid made with that bank, and also of the one so as aforesaid made with the said River Raisin Bank.”
That “ said Stewart, as agent of the Phoenix Bank, presented said claim to the Legislature of the State of Michigan, at the sessions thereof, held in 1841,1842, 1843, 1844, and 1845, and said Stewart stated to the committees of the said Legislature, to whom said claim was by said Legislature referred, the settlements which he had so as aforesaid made with said River Raisin Bank, and the Michigan State Bank, and their nature, and argued that by virtue of those arrangements the State of Michigan would reap the benefit of the securities he held, in case the State satisfied the claim of the Phoenix Bank.”
That “ the statement of the claim, as presented to the Legislature of the State of Michigan, as aforesaid, in 1841, was in writing, and detailed the facts in which the claim had its origin, and stated that the draft on the Farmers’ and Mechanics’ Bank was paid to Norton, and credited by him to the Phoenix Bank, and not to the State, and that the draft on the River Raisin Bank was not collected by him, and also stated that the payment of the debt will not be a loss to the State, for security is now held by a trustee from the Michigan State Bank and Bank of River Raisin, for both debts, which will be turned over to the State.”
.That “ these banks were both insolvent; they were continually threatened with suits and injunctions, and receivers ; they wire parting with their assets, and existed at the precarious forbearance of creditors; experience had shown that to pass a bank into a receiver’s hands was equivalent to destruction, and it was deemed a matter of judicious precaution by the Phoenix Bank, and by the Auditor General for the State, to secure good property while it could be had for the benefit of the ultimate creditors of these banks.”
That “ the statement of said claim, presented to the Legislature in 1843, offered to compromise the claim, on *75 the principle that the State should repay the draft actually paid to Mr. Norton, and in that event the Phoenix Bank would 1 abide the other at their own risk, though by so doing ’ (as said statement declares) ‘ they are turned over to a number of alleged securities, which, in the course of events, not here necessary to state, have taken the place of the River Raisin Bank, as debtors.’ ”
That “ beside the oral and written communication so made by Mr. Stewart, to the committees of the Legislature, to whom said claim was referred, he also informed Mr. Hastings, in 1840 and 1841 (he then being Auditor General of said State,) of these settlements, also Charles G. Hammond, his successor in that office, and Mr. Belle, in 1848, who was then Auditor General. He also in 1840, 1841, and 1842, informed Peter Moray (then Attorney General of said State,) of said settlements, and Zephaniah Platt, his successor in that office.”
That “ Stewart, by a letter addressed to the Phoenix Bank, dated February 10, 1842, informed said bank that he had then recently received $225.75, on one of the securities transferred to him on his said settlement with the River Raisin Bank.”
That “Stewart, by a subsequent letter, addressed to said Phoenix Bank, dated November 9, 1842, advises a change of some of the securities so as aforesaid taken from said River Raisin Bank, and remarks ‘ will you please give me your wishes on the subject of converting your securities.’ ”
That “ to this the said Phoenix Bank replied by a letter to said Stewart, dated the twenty-first of that month, that we must leave it entirely with you to make such settlements, or change of securities, as you may deem, under all circumstances, to be most for our interest, not doubting that you will use a prudent discretion in all such matters.”
That “Stewart, by the 30th of October, 1843, had collected, in all, from the said River Raisin Bank securities, about $2,000 over and above his expenses, and had substituted the residue of. such securities for lands in the State of Michigan; and in and by a letter to the said Phoenix *76 Bank, dated on the day last named, informed said bank 1 that the securities ’ (so as aforesaid taken by him from said River Raisin Bank) 1 have all been converted into good lands in this State ’ (Michigan.)” ‘
That “said Stewart left the State of Michigan in 1848, but did not cease to be connected with said claim as agent of the Phoenix Bank,.until the 5th of August, 1852.”
That “by a deed, dated and delivered on the day last named, said Stewart conveyed to the Phoenix Bank the lands which said Michigan State Bank had conveyed to Stewart by the deed of October 2, 1840.”
That “ the actual motive of the Phoenix Bank in taking said deed of August 5, 1852, at. the time it was taken, was to place itself in a condition to be able to transfer the property (thereby conveyed) to the State of Michigan, on the allowance and payment by the latter of the said claim of the Phoenix Bank.”
That “the said Phoenix Bank, on the same 5th of August, 1852, executed a deed of settlement and release between said bank and said Stewart, which was also executed by said Stewart, and delivered on the day of its date, and reads thus, viz.:
, 1 This agreement, made the 5th day of August, A. D. 1852, between the president, directors, and company of the Phoenix Bank, of the city of New York, of the first part, and Charles H. Stewart, formerly of Detroit, but now of Washington city, of the second part, witnesseth: Whereas, on the 10th day of June, A. D. 1840, the said bank employed the party of the second part .as its agent to prosecute a certain claim for $16,400 against the State of Michigan, with a contingent interest of ten," afterwards increased to twenty per cent., and certain powers to said agent; the said claim consisting of an advance by the bank to John Norton, Jr., cashier of the' State Bank of Michigan, for the State.
‘And whereas, the said advance was made by the order of the Phoenix Bank on the Farmers’ and Mechanics’ *77 Bank and the Bank of River Raisin, the order on the first being paid, and the second unpaid.
‘And whereas, the party of the second part was subsequently authorized by the said Phoenix Bank, and the Auditor General of the State of Michigan, to take any securities in his discretion, from either of the ultimate debtors in the matter, and to hold the same for the Phoenix Bank or the State of Michigan, whichever would assume the debt. And pursuant thereto, the said party of the second part did subsequently take some securities from the said parties, and among them the land hereinafter mentioned, of all which, and of his proceedings in the matter, the party of the second part duly informed the said Phoenix Bank from time to time, reference being here made to his letters. And whereas, the said bank now desires the cancelment of the interest and rights of the party of the second pari, and possession of all the papers in the case, including those which were acquired by the said party, with his arguments and facts. And the said parties have finally concluded all their former, relations, and all questions between them, as follows:
‘ Now, therefore, this agreement witnesseth: That the said party of the second part, for the considerations after mentioned, herewith transfers and delivers to the party of the first part all the papers in his possession pertaining to the aforesaid claim, including his legal argument and the result of his researches in the matter, the particulars being specified in a separate inventory and' receipt.
‘And doth hereby also' covenant, promise, and agree to and with the party of the first part, that he, the party of the second part, shall and will convey to the party of the first part, or their president for them, all the lands and premises conveyed to him by deed bearing date the second day of October, A. D. 1840, executed by George S. Porter, president of the State Bank of Michigan, and recorded in the Register’s office, in Saginaw county, on the 6th day of October, A. D. 1840, in deed book B, on pages 321 and 322, as fully as the same were so conveyed, and free from all *78 incumbrances by him, the party of the second part, except taxes : and as to them, the said party covenants and agrees that he will procure the said lands to be cleared from all tax incumbrance, and from the title of any alleged tax purchasers without charge for his own services, the party of the first part doing as after mentioned on their part, and will also give any requisite explanation in the premises. And the party of the second part, in consideration of the payment, release, and agreements hereinafter mentioned, releases, remises, and forever discharges the party of the first part from all claim or demand whatever in the premises, either for professional service, money spent, and interest in the claim or control of the proceedings or otherwise, however. And the party of the first part, in consideration of the covenants, services, transfer, and release aforesaid, agrees to pay the party of the second part, on execution hereof, the sum of five hundred and twenty-five dollars, and to pay on demand all money which the party of the second part may find to be necessary for clearing the tax-titles and taxes aforesaid, including any charges made by others for local services, and any expenses actually incurred by the party of the first part for the considerations above, hereby remise, release, and forever discharge the party of the second part, of and from all claims, demands, accounts, and responsibilities whatever in the premises, except the matters and things herein and hereby agreed to be done, and for all other demands whatsoever.
1 In witness whereof, the party of the first part hath caused its president to execute these presents, and attached hereto its corporate seal, and the party of the second part hath set his hand and seal, the day and year first in these presents written.
‘ T. TILESTON, [n. s.]
1President.
1 CHAELES H. STEWAET. [l. s.]
‘ Witness—
‘ John Parker, [l. s.]’ ”
*79 “The State of Michigan never assented to, or had any' notice prior to January 1, 1855, of the execution of either of said deeds of August 5, 1852; of the said acts and doings of said Stewart in respect to the securities so as aforesaid received by him on his said settlement with the said River Raisin Bank; or of the notice so as aforesaid given by said Phoenix Bank to the River Raisin Bank, not to pay the said draft for $7,900, so as aforesaid advanced to said Norton.”
' The above findings of fact are clearly supported by the evidence.
The two drafts were given to the agents of the State in good faith, and in firm reliance upon the credit of the State. The draft of $8,500 was duly paid and the money went into the hands of the agents of the State; the other draft of $7,900 upon the Bank of the River Raisin, in which were the funds of the Phoenix Bank with which to pay it, was not protested or returned to the Phoenix Bank. The State withdrew all its securities from the hands of Mr. Delafield and neglected to pay the amount of these drafts. Some two years after the State securities had all been withdrawn from the hands of Mr. Delafield, the Phoenix Bank, not yet having been paid by the State of Michigan, and learning that the funds in the River Raisin Bank, against which the draft óf $7,900 had been drawn, were still in the River Raisin Bank, the cashier of the Phoenix Bank wrote to the cashier of the River Raisin Bank as follows, viz.:
“Phoenix Bank, l
New York, 26th March, 1840. j “N. R. Haskell, Esq., Cashier, Monroe:
“Dear Sir—-Your favor of the 17th ult. was duly received, with account which agrees with our books.
“The draft to which you allude was for $7,900, and was dated 29th March, 1838. If it has not been paid by you, you will please refuse payment of it, as we have never received value for it; and if not actually paid, prior to this notice, we shall look to you for the amount.
“ Respectfully yours,
“ N. G. OGDEN, Cashier.”
*80 It does not appear that the State lost any rights in consequence of this notice ; and it does appear that the money remained on deposit for some two years, ready to meet the draft when presented, and that it was never paid over by the Bank of the River Raisin to the Phoenix Bank, and that through the negligence of the fiscal agent of the State the draft was not collected, so that it is quite clear that the original claim of the Phoenix Bank was not inequitable. I think it also clear that if the State had paid this claim while it was in the hands of Stewart, and had taken a transfer from him of all the securities which he had received from the two banks, the State would have had no just cause of complaint, (although ignorant of the aforesaid notice,) and that, in such case, this action could not have been maintained. Upon this branch of the case I adopt the views and the felicitous language of the learned chief justice who tried the caxise : • •
“When the cause was before the general term of this court, it was held that the decision by the Board of State Auditors of the State of Michigan, to the effect that, upon the evidence produced before the said Board, the Phoenix Bank was justly and equitably entitled to the sum of $35,603.14 as its just claim against said State, could not be impeached except upon proof that the Phoenix Bank had practiced some fraud in their proceedings to establish said claim before and to procure its allowance by said Board.
“That decision should conti’ol my action in respect to that question upon this trial, even if I doubted its accuracy ; but I think that point was correctly decided by this coux’t at its general term in March, 1859.
“ The board of State officers were not misled as to the facts upon which the question of the original liability of the State depended and was to be determined. The same evidence, substantially, in respect to that question, was placed before the Board of State Auditors, as has been ■ produced on this trial. There was no misrepresentation or concealment as to any facts bearing on that question, *81 which could mislead a discreet and cautious mind; and the Board decided that the State, in justice and equity, was originally liable to refund the sum which the Phoenix Bank advanced to Norton. t
“ If my opinion differed from that of the Board of State Auditors, as to that question, I should not be at liberty to declare their decision null and void for that cause alone, and order the money which the State has paid to the defendants to be refunded.
“Neither would the fact of the settlement made by Stewart, as agent of the Phoenix Bank, with the Michigan State Bank and the River Raisin Bank, considering the circumstances under which they were made; the assent given to them by the then Auditor General of the State of Michigan (though not legally binding on the State); and the further fact that such settlements were not called to the attention of the Board of State Auditors, justify me in giving judgment for the plaintiffs; if the Phoenix Bank had not subsequently done anything to vary the condition and position in which the parties were placed by those settlements, and to mislead said Board in respect to the actual facts of the case.
“ The State was notified and reminded, year after year, for some years subsequently thereto, of the facts and terms of such settlements; by a communication thereof, made to several of its State officers, and to its Legislature when the claim was presented to that body. A mere omission to recall the fact of these settlements to the attention of the Board of State Auditors would not, on such a state of facts, be of itself a sufficient .cause for adjudging the decision of such Board to be a nullity.”'
The views of the counsel for the State of Michigan, touching the fraud, are stated in their fifth proposition, as follows:
“ Fifth. - If the decision of the Board of Auditors is to be claimed to have the force of a judgment at law, then it is void, as having been obtained by fraud.
I. There was a fraudulent suppression of the truth by *82 the bank, in withholding from the Board of Auditors the knowledge of facts which bore directly upon the justice of the claim, which it was the right of the Board to know, and which it was the duty of the defendants to communicate.
a. The facts thus fraudulently suppressed were: the let- ■ ter of countermand of the draft of $7,900; the settlements made by Stewart with the Bank of the River Itaisin and the Michigan State Bank; the demand by the defendants from Stewart of the deed of August, 1852, and its execution to them by Stewart; the exercise by the defendants of control and ownership over the securities received by Stewart; the exchange of a portion of these securities for lands in Michigan,, and the release by the defendants of Stewart from all liability to account for the $2,000 which he had collected out of the securities.”
Let us test this proposition by practical examples. A., living in Detroit, owes B., a resident of New York, and with intent to pay his debt draws a sight draft upon 0., his hanker in Wall street, where he has funds. B. receives the draft in New York, on the eve of starting upon a trip of pleasure; having full confidence in the drawer of the bill, and also in the banker upon whom it is drawn. B. puts the draft in his pocket and goes to Newport. The banker remains solvent for two months after, and then fails. B. hearing of the failure, presents the draft, and has it protested ; and then sues the drawer in the courts of Michigan. A., the drawer, pleads the general issue. When the cause is called in its order for trial no one appears for the defendant, and the .plaintiff’s counsel states to the court his cause of action, and promises to state every defense of which he has any knowledge, or which he has heard “hinted at;” but in the statement which he makes no mention is made of the plaintiff’s negligence in presenting the draft, while the banker upon whoni it was drawn was solvent, and by which negligence the money was lost. Judgment being obtained, A. pays it, and B. returns with the money to New York. Subsequently A. learns of B.’s negligence in presenting the draft—of the statement made to the court by the *83 counsel of B.; and that the counsel was at the time aware of the negligence. A. then sues in this court to recover back the money which B. had recovered of him by a regular judgment in the courts of Michigan; and rests his right to recover on the ground of fraud, the fraud consisting in the suppression of facts by plaintiff’s counsel, which if disclosed, would have defeated his case. If this proposition is sound, I see not why money paid upon any judgment, however regular, recovered by default in another State, may not be recovered back by suit in this State, on proof that the counsel who obtained the judgment told the court that he would state every defense to the action of which he was aware, and yet failed to state one defense of which he had knowledge, and which being stated, the court would not have rendered judgment for the plaintiff," and the money having thus been recovered back, the party last paying it might, on the like grounds of fraud, again recover it in some other State, and so the money might be tossed from A. to B., and from B. to A. without end.
The State of Michigan has no advantage in a court of justice over the Bank of Michigan. Suppose the Bank of Michigan should sue the Phoenix Bank in this court to recover fifty thousand dollars of money paid for the defendants, at their request; that the attornies of the respective parties should stipulate, that on the trial the defendants might interpose such answer as they might be advised; that upon calling the cause, the defendants’ attorney not appearing, the plaintiffs’ attorney should state to the court that he would mention frankly and fairly every defense that “ he had ever heard hinted at,” and that while making this profession of fairness he was well aware that the statute of limitations was an absolute bar to the claim, and which, if known to the court, would defeat the suit; and yet, that he carefully and intentionally concealed that fact from the court,'took judgment on his proofs offered, and afterwards obtained the money and satisfied the judgment; could the Phoenix Bank recover it back in the courts of Michigan on the gtound that it was obtained by fraud ? I *84 am clearly of opinion that no such precedent can be found, and that the very able arguments of the counsel for the State of Michigan, and the authorities cited in support of those arguments do not apply to a case of this kind; they apply with great force and effect to a case in which one party has by false statements or by dishonest suppressions of the truth, induced another to part with his money or his goods.
The case of Dobson v. Pearce, (2 Kern. 156,) was an action in this court upon a judgment which one Olney had recovered in the same court against Pearce, and which Olney had assigned to Dobson. Pearce was a resident of Connecticut, and while casually in New York, Olney sued him upon a claim which had no just or legal foundation. After the capias was served, Olney assured the defendant that no further proceedings would be taken, and Pearce relied upon the assurance; afterwards Olney, fraudulently, and without the knowledge of the defendant, procured judgment to be entered in the suit, and upon a false and unfounded claim, known to be so by Olney at ifche time. Subsequently Olney commenced suit upon this judgment against Pearce in Connecticut, and Pearce, the defendant, thereupon commenced suit against Olney in chancery before the same court, Olney appearing in that action. Pearce obtained a decree against Olney declaring the judgment fraudulent, and enjoining Olney from further prosecution of the action upon it. This was, however, upon the ground that the judgment had no honest basis, and was obtained by fraud ; fraud upon the party—direct and clear; not fraud upon the court, perpetrated by some statement of an attorney upon the trial of the cause.
The case of Foster v. Wood, (6 John. Ch. 87,) which the plaintiffs cite, so far as it bears upon this case, seems to me quite against the position which the plaintiffs take.
The case of Shedden v. Patrick, (28 Eng. L. & Eq. 56,) was heard in the House of Lords in 1854. This was an attempt to set aside a decree on the ground that it had been obtained by the fraudulent collusion of both parties, *85 in order, by means of that decree, to defraud an infant who was a nominal party. The plaintiff was unsuccessful, but the House of Lords recognized the right to annul the decree on proof of the fraudulent collusions; a doctrine which, I think, no one will question.
The case of Fenemore v. The United States, (3 Dallas, 357,) was where a certificate of stock in the public funds had been obtained from the United States upon a false and fraudulent account, supported by false and fraudulent vouchers; and it was held that, in an action on the case for fraud the United States might recover as damages the value of the certificate of stock; a decision most manifestly just. Indeed, after careful examination of the cases upon which the counsel for the State of Michigan relied, and after diligent investigation of many other cases, I am not able to find a single authority which can support the plaintiffs’ judgment in this case.
»In the case now before us, the Phoenix Bank employed Mr. Lothrop, a counsellor-at-law, residing in Detroit, to prosecute their claim against the State of Michigan. Mr. Lothrop proceeded in a tribunal of competent jurisdiction to collect this claim. The State was duly notified, and its proper officer, the Attorney General, was duly advised of the proceedings. The counsel for the Phoenix Bank stated his case to this special court in writing, presented his proofs, obtained a decision in his favor, and the money thus recovered was afterwards paid over by direction of the Attorney General of the State. When this claim was thus prosecuted before the'tribunal which the State had created for that and other like purposes, the State knew, or ought to have known, that Stewart had received securities from tlio two aforesaid banks to be held in trust as security for this claim of the Phoenix Bank. It was thus clearly the duty of the State to examine into this matter, and to see what Stewart had done as trustee, and to make any offsets against the claim of the Phoenix Bank, if the State desired to make any such offsets at that time. The State were not compelled to make any claim of offset before the Board of Audi *86 tors—they might pay the demand of the bank and then call upon Stewart to account. for the securities which he held as trustee, if they preferred that course. But the State has no ground for pleading ignorance of the fact that Stewart received property from the two banks in trust for the State of Michigan, provided the State should pay the claim of the Phoenix Bank. The fact that, the tribunal which passed upon the claim of the Phoenix. Bank was ignorant of certain defenses which .the State might have interposed, is a matter of no especial moment. The State was fairly impleaded, and it was its duty to present defenses to the claim if it wished there to make them; it was not the business of the counsel for the plaintiff prosecuting the claim to seek for defenses to it. The great error of .this case seems to be, that the Board of State Auditors are treated as the State, and not as a court, in which to try claims against the State. This Board no more represented the State than the Supreme Court represented the State. It was bound to regard the rights of the Phoenix Bank with equal zeal as those of the State of Michigan—it was a tribunal—a court, in which plaintiff and defendant met on equal terms, and where they were entitled to. equal protection. For this reason, it seems to me, that the entire structure, built upon the theory that this money can be recovered back as obtained by fraud, falls to the ground. What was the fraud and how perpetrated ? The Phoenix Bank sued the State of Michigan,, and presented before the court a claim not inequitable in its origin, and which that tribunal deemed to be just. The State may have had defenses which it might have successfully interposed. The State neglected to make those defenses; suffered judgment, and paid the money. On what principle known to the law can it be said that this money was obtained by fraud ? So far as the original demand of the Phoenix Bank is concerned, there is no pretence that the Board of Auditors were in any manner deceived—they declared the claim just—the State paid it in full without making any claim of offset. The Phoenix Bank are, therefore, bound to account to the State of Mich *87 igan for any property which they have received from, any source whatever, as security for, or on account of the claim, thus paid by the State. But I am not aware of any precedent, or any principle, upon which the State of Michigan can recover back the money which the bank received, on the ground of an j fraud which this case discloses. When once established that the original claim was just, and that the Board of Auditors were a judicial tribunal with full jurisdiction of the parties and of the subject, it follows, that the plaintiffs cannot recover back the money on the ground of fraud. Some recovery may no doubt be had, but not on the ground .offraud. The judgment should be set aside and a new trial granted, with costs to abide the event.
Woodruff, J.
—It is settled in this court, by the former determination made herein at General term, that the decision of the Board of State Auditors of the State of Michigan that the Phoenix Bank was justly and equitably entitled to the sum of $35,603.74 from the State, could not be impeached, nor the said sum paid on that decision be recovered back, except upon proof that the Phoenix Bank had practiced some fraud in their proceedings to establish the said claim and procure its allowance by the said Board.
And with this proposition before my mind, I concur in the views expressed in the opinion pronounced at the Special term on the last trial of the action:
That the Board of State officers were not misled as to the facts upon which the question of the original liability of the State depended or was to be determined;
That the fact of the settlements thereafter made by Stewart," as agent of the Phoenix Bank, with the Michigan State Bank and the Eiver Eaisin Bank—made with the assent of the Auditor General, and notified to the State from year to year for several years, through its Legislature and State officers, prior to the trial before the Board of Auditors—does not justify any inquiry into the validity of the decision;
*88 That the omission of the Phoenix Bank, or its attorney, to call the attention of the Board, on the trial, to the fact that such settlements were made, is no cause for avoiding the decision of such Board. The State, having knowledge of the fact, had an opportunity to present it for consideration if it deemed it material;—
• And that, thereford, if the Phoenix Bank had not, subsequently to those settlements, done any thing to vary the condition and position in which the parties were placed by those settlements and tq mislead the said Board in respect to the actual facts of the case, there would be no ground whatever for impeaching the decision of the Board, or for requiring the repayment of the money received by the-defendants in pursuance of that decision.
But after those settlements, Stewart, the agent of the Phoenix Bank, even in the view of the subject most favorable to the defendants—and the view which must have been taken by the Board of Auditors—occupied a new arid confidential relation to the State of Michigan. He held the -securities and property received from the banks as security for the debt which the Phoenix Bank claimed from the State, and in the event of the payment of that debt, the State was entitled to claim those securities and property for its own reimbursement or indemnification^ and any dealing between Stewart and the Phoenix Bank which impaired those securities or property, or operated to deprive the State of their right or opportunity to obtain the full benefit thereof, was a fraud upon the State—a fraud which could work no injury so long as the State paid nothing, but which would be fully consummated by concealing the facts from the State and prosecuting the claim to a recovery of the moneys. To my mind the idea that the State failed in any diligence through which the facts might have been discovered previously to the trial before the State Auditors, is answered by the considerations that Stewart had long previously removed from the State; that he held a confidential relation to both parties, and nothing had occurred which ought to have created distrust on the *89 part of the State; and that, the State having knowledge that a fund had been created by the settlement with the Michigan banks, which was held by a trustee for the benefit of whichsoever of the two parties might become entitled thereto by assuming or bearing the debt, there was nothing to put the State upon further inquiry pending the determination of the question between the parties; there was nothing to create a doubt that the securities and property remained in the hands of the trustee unimpaired, awaiting that determination. The State was not bound to suspect that the trust fund or the responsibility of the trustee had been in any manner altered prejudicially to them and to make an investigation suggested by that suspicion. . The trust having been created in mutual confidence, the State had a right to repose in that confidence, (nothing being brought to its notice calculated to impair it,) while the defendants were bringing their claim to the original cause, or alleged cause of action, to a decision; and it is not now for the defendants (who had dealt with the trustee and released him, and given up a portion of the securities and property, knowing that $2,000 had been realized by the trustee,) who pursued their claim to the entire amount, knowing that the State was in ignorance of what had been done, to say that the State ought to have distrusted the trustee chosen by the bank, and their agent in fact, and distrusted them also, and made inquiry whether there may not have been a breach of confidence and of trust.
Stewart, though trustee under the arrangement upon which he made the settlement with the Michigan banks, was the paid agent of the Phoenix Bank; nay more, he was, if they elected so to treat him, under their control; they had a right, as between themselves and Stewart, to take the property, securities and. money, which came to his hands, and treat it as satisfaction of their claim; and the State of Michigan, having paid nothing, could not complain of'that arrangement, and in this view the loss or conversion of the property by StewTart, with the assent .of the Phoenix Bank, should affect the latter to the same *90 extent in favor of the State of Michigan, as if these were the acts of the Phoenix Bank itself.
I am, therefore, constrained to dissent from some of the views of my brethren on this appeal.
I am of opinion, upon an examination of all the evidence, that the finding of the court at special term that the judgment was obtained by what in a court of equity should be deemed fraud, is sustained by the evidence ;
That the Phoenix Bank, from the position in which they stood, owed a duty to the State of Michigan" in relation to the, trust fund with which they had been dealing, which bound them to apprise the State that $2,000 had been collected, and that all the securities and property received from the River Raisin Bank had been relinquished, and Stewart released by themselves from all liability, the lands, &c., received from the Michigan State Bank alone being saved " from the trust fund for the ultimate indemnity of the State;. facts, all of them material, unknown to the State—known to be so—concealed by the Phoenix Bank (as proved and properly found upon the evidence,) with design and intent to mislead, and with a conscious belief that if disclosed their recovery would be defeated ;
That the suggestion that the State of Michigan has not been prejudiced, but have still full recourse to Stewart, the trustee, will not avail the defendants, for two reasons: 1. If the facts had been disclosed the State would (if Stewart be regarded as mere trustee, alike under the control of either party and not capable of being effectually discharged by either,) have had an option to charge Stewart, as trustee, notwithstanding the release by the defendants, or to charge the defendants with the trust fund so lost or converted by their assent in exoneration pro tanto of the responsibility of the State. 2. The relations of the Phoenix Bank to Stewart, their agent, who had been constituted trustee, were such (not only as pi’incipals but as creditors and parties beneficially interested,) that they had power (as between him and them,) to settle with him ■ and discharge him from his trust ;
*91 That by their settlement with him and their release of him, they have voluntarily deprived the State of Michigan of any recourse to him in respect of the security and property held for the debt originally due by the Bank of the River Raisin and the $2,000 collected by him from the same, and such settlement operated as between the State of Michigan and the Phoenix Bank as a satisfaction of that debt and an extinguishment of all claim against thé State on account thereof, as effectually as if Stewart had collected the whole of it and paid the amount to the Phoenix Bank. And if it were even conceded that Stewart might be liable to the State, notwithstanding such release, the State have nevertheless the right to regard the transaction as it was intended by the Phoenix Bank to operate as to Stewart, viz.: as a release, and then the result is as before; it is as to the Phoenix Bank satisfaction of the debt due by the Bank of the River Raisin and fro tanto an extinguishment of the claim upon the State. And it was the clear duty of the Phoenix Bank, who thus assumed to deal with the trustee and the trust property, to disclose such dealing and the settlement so made, to the State of Michigan. The situation of the Phoenix Bank was analogous to, or perhaps identical with, that of a creditor for whose benefit a mortgage is held by a third person (his agent,) as collateral security, but which the debtor will be entitled to have and collect for his own use on payment of the debt, and the creditor, without the knowledge of the debtor, obtains an assignment of the mortgage from his agent (the trustee,) and releases or cancels it, and concealing the facts from his debtor obtains judgment against him for the original debt, which by the appropriation and conversion of the security had in equity been satisfied. Can it be doubted that, on making discovery of the facts, such debtor could obtain relief in equity against the judgment ? I think not. The court would not entertain the suggestion from such creditor to the debtor: “You ought to have suspected my fraud and found it out before judgment.” On *92 the contrary, such debtor had a right to rest in confidence that the trust would be faithfully observed.
So that, assuming the award of the Board of State Auditors to have been correct upon all the other facts, and to be conclusive as a final determination of a competent judicial tribunal, and that by it all inquiry into the origin and primary validity of the claim against the State is precluded, still the withholding from the State of all knowledge of the settlement with Stewart was a breach of the duty of the bank and a fraud upon the State of Michigan, which entitled the latter to be relieved in equity from that judgment so far as that settlement affected the State to its prejudice, and that is to the extent of the debt originally due from the Bank of the River Raisin.
But the relief to be granted does not, in my opinion, extend beyond the amount of the debt last named. In relieving against fraud it is unnecessary to go further than to redress the injury which was effected by the fraud, and the fraud complained .of should be material and have manifestly affected the judgment. If a judgment were recovered against the endorser or the administrator of the maker of two notes, and it is afterwards shown by the debtor to a court of equity that one of the notes had been paid, but that by such a fraud as justified the interference of that court the creditor had succeeded in so deceiving his adversary that the judgment" was recovered upon both, the interposition of the court would be confined to the amount of the note so paid. That is all that the debtor could equitably ask, and as to the amount of the other note the judgment and payment thereof should stand. So here, in respect of the claim of the Phoenix Bank to the amount originally due from the Michigan State Bank, the State of Michigan has not been injured; it has not only suffered no prejudice but presumptively has been benefited. It was not the settlement with Stewart alone, but the concealment of that settlement that constituted the injurious fraud in obtaining the judgment in question. The act of the Phoenix Bank, in making that settlement, and obtaining from *93 him the conveyance of the property held as security for the debt of the Michigan State Bank, was, upon the evidence, discreet, and was done with proper motives and in the belief that it was for the best interests of all parties. The security last named is still (so far as the proof in this case discloses, and so far as it was conveyed by Stewart to the bank,) within the control of the bank and subject to the call of the State. The conveyance was taken by the bank as a measure of safety and precaution, and the mere fact that the property was thus taken out of the hands of an absent trustee, who had removed from the jurisdiction of the two States (New York and Michigan,) should furnish no reason for charging the Phoenix Bank, against their assent or intention, with satisfaction of that debt. It would not only, in my opinion, be inequitable, but would be giving effect to the concealment of this fact which is not warranted. So far as relates to this debt, the concealment of the transfer to the bank, as a precautionary measure, was an immaterial concealment. It is not agreeable to good sense nor just views of equity to suppose that had this fact been known to the Board of Auditors it could have affected their decision, and the fraud, which alone can justify the impeachment of a judgment, must be one without which it appears the judgment would not have been rendered. The State of Michigan is entitled to the security so transferred to the Phoenix Bank but have been in no wise prejudiced by the transfer.
In my opinion, therefore, the State of Michigan is entitled to their judgment to the amount of the claim against the Bank of the River Raisin but to no greater amount, and that as to the excess the judgment should be reversed.
New trial ordered, with costs to abide the event.