Rule accordingly.

---

## *Ex parte* CHARLES ROGERS and WALTER ROGERS.

E. COWEN, for the relators, moved, at the last May term, for a mandamus to the acting canal commissioners, Messrs. *Samuel Young, Henry Seymour and William C. Bouck, commanding them to pay over a sum of money assessed as damages sustained by the relators, in flowing their lands by means of a dam across the Hudson river, to feed the Champlain canal: or that a mandamus issue to Mr. Young, commanding him to sit with his co-appraisers, if this court should think the assessment imperfect by reason of his attempt to prevent it.

The counsel read affidavits showing that Mr. Young, one of the canal commissioners, with Messrs. Joseph D. Selden and David Woods, they together constituting a regular and competent board of appraisal, had fully heard and examined the merits of the relator's claim, on the testimony of witnesses and on hearing counsel; in the course of which Mr. Young freely communicated his views in presence of

*Margin headnote:* An appraisal of damages done by the z [*527] canal, made by the two canal appraisers, appointed pursuant to the act of 1825, (sess. 48, ch. 274,) is valid, provided one of the canal commissioners be associated with them in hearing and conferring on the merits of the claim, though he finally dissent from the appraisal, and declare himself absent, and not a member of the board.

Where any number of persons are appointed to act judicially in a public matter, they must all confer; but a majority may decide; though the minority dissent and refuse to be farther considered members of the board. And *vide* note (a) at the end of this case, where the rule is exemplified by several cases.

The canal commissioners are bound to pay assessments made under the statute, (sess. 48, ch. 274;) and if they refuse, a mandamus is the proper remedy.

On application for a mandamus, where both parties are heard, and there is no dispute about the facts, and the law is with the application, a peremptory mandamus will be granted in the first instance.

Where a statute or charter positively requires that a certain number of persons shall be present at the consummation of any act, they must all be so present; and the act is not good, though it be begun while all are present, if one of them depart, though wrongfully, before its consummation. This rule exemplified by the cases. *Vide* note (a) at the end of this case.

Otherwise, it would seem, where such presence is not thus positively required. Id.

All the *integral parts* of a corporation necessary to do an act, must continue present till the act is consummated. Id.

What is meant by the *integral parts* of a corporation, with several examples.

the parties, and his co-appraisers. The counsel then read the certificate of the latter gentleman, setting forth, that in December, 1825, the relators made a written application to Mr. Young, and the other appraisers, setting forth that the lands of the relators had been inundated and destroyed by the dam; claiming damages of the state; and requesting that the three would assess the damages. That they all convened immediately, and heard the proofs and allegations of the relators, at Fort Edward, but separated without deciding upon the claim.

The certificate then proceeded thus: "The said three appraisers being now again convened, and having met together at the city of Albany, &c., on the day of the date of these presents, the subscribers deciding that they will now go on and decide the said claim for damages, the said Samuel Young now dissents therefrom, refuses to act, and declares himself absent, and not a member of the board. Thereupon, we, the subscribers, do adjudge the aforesaid representations of the said Charles and Walter to be true.

" And we, the subscribers, two of the said appraisers, being now convened, do further adjudge, consider and determine, that the damages sustained by the said Charles and Walter, by means of the erection of the said dam, are 5,433 dollars. And we do hereby assess and appraise their *aforesaid damages, so claimed by them as aforesaid, as due from the state of New York, at the aforesaid sum, &c. Given, &c., this 24th day of March, A. D. 1827.

Signed,       JOSEPH D. SELDEN.<br>DAVID WOODS.

[*528]

The counsel also read affidavits verifying the facts stated in the certificate; and showing that the money had been demanded of the canal commissioners, who had refused to pay it; and that copies of the papers upon which the motion was founded had been served on Mr. Young.

To show that the board of appraisers were a judicial body, and that the canal commissioners were bound to pay their assessments, the counsel cited the various statutes on the subject: Act of 1817, sess. 40, ch. 262, s. 3, p. 303;

Act of 1821, sess. 44, ch. 240, s. 1, p. 248; Act of 1825, sess. 48, ch. 275, s. 1, p. 398.

That the board being assembled, the appraisal by a majority is valid, he cited 1 Kyd on Corp. 308 ; 6 John. 41, and the cases there cited; 11 John. 402; 1 John. 500.

He also referred to *Rex* v. *Beeston*, (3 T. R. 593,) as in point, not only to show that the appraisal was valid, but to prove that a writ of mandamus is the proper remedy for enforcing payment of the money.

*Talcott*, (attorney general,) did not deny that, perhaps an alternative mandamus should go commanding Mr. Young to associate with, and finally decide upon the claim of the relators.

But he insisted that the appraisal was invalid, in consequence of Mr. Young declaring himself not to be an acting member of the board; that there is nothing in the statute vesting the right to assess in a majority ; and without such a provision, the whole are necessary to constitute a *quorum* which must continue till the appraisal be complete ; though a majority, the *quorum* so continuing, may decide.

*Cowen*, in reply, admitted that the *quorum* must continue for all substantial purposes. But, he said it had been *so continued. The object of the rule is to combine the opinions and advice of the whole judicial body. This matter had been before that body for more than a year; when one of them, finding his brethren inclined to decide, declares himself absent. But this did not make him so. He might meet his co-appraisers again under the mandamus of this court ; and on the eve of their decision make the same declaration, without violating the command of the writ. Even if he had actually departed, which was not pretended, the rule contended for by the attorney general would be satisfied.

[*529]

The case lay for advisement to the present term.

*Curia.* We have looked into the various statutes cited

by the counsel for the relators; and find that the canal commissioners are the persons whose duty it becomes to pay assessments of damages occasioned by either of the canals, when such assessments are regularly made. No change has taken place in this respect since the statute of 1817; though several alterations have been made by the legislature, from time to time, as to the persons who were to make the appraisal. First, the appraisal was by commissioners under the appointment of this court; then by the canal commissioners; and finally by two persons appointed permanently by the senate on the governor's nomination, and specially for that object, to be associated with a canal commissioner. This was by the act of 1825, under which the relators sought to have their damages appraised. Whether they have been successful, is the question in controversy.

These three persons, the canal commissioner and the two appraisers, constitute a judicial body, a tribunal appointed by law to act in a matter of public concern, in the decision of controversies, or causes of a certain character between individuals and the state.

This is not then a question arising upon a private arbitration where the judges are chosen by the parties. The party injured has no voice in their selection. In case of a private arbitration, unless provision be made by the submission *that a majority may decide, the whole body must be unanimous. (6 John. 39, 41.) But in regard to a public judicial body, it is clearly settled, that though no provision be made, giving a binding effect to the decision of a majority, yet where they all convene and act, the majority may decide, notwithstanding the express dissent of the minority. (6 John. 41; 1 B. & P. 236; 3 T. R. 592; 11 John. 402; 1 John. 500. What was done in this case short of that? The commissioner, one of the three appraisers, dissents, and declares himself absent, and not a member of the board. He had assumed the trust delegated to him by the legislature; and had been actively engaged in its execution as a member for a long time. After a full investigation, he had, it is to be presumed, joined in carry

[*530]

ing on the deliberations of the board from time to time, till
the eve of the final decision. Can his simple declaration
of absence at that point of time, subvert his character as a
member of the appraising body? We are warranted in
saying his counsel had been bestowed, and that the other
members had heard and appreciated his advice; because
every officer is presumed to have done his duty. Such ad-
vice is the object of the rule which requires all to asso-
ciate; but at the same time, allows a majority to decide.
After so full a compliance with the spirit of the rule, we
cannot admit that this desertion of the board, should have
the effect to invalidate the assessment. It is no more, in
effect, than a ceasing to confer farther on the question; a
point to which every discussion must come, when the argu-
ments for and against are exhausted. The actual absence
of the dissenting member then ceases to be material, un-
less his presence be required for formal or other purposes,
by some positive provision or rule:(a) *much less in his          [*531]
declared absence; while he is, in fact, present with every
opportunity to contest the final decision.

(a) Where a public act is to be done, by three or more commissioners ap-
pointed in a statute, and a competent number have met and conferred,
though they separate, and a majority do the act, without the presence of the
other, the act seems good in construction of law; though it is otherwise
where there is a positive statute, or charter, requiring that a full board
should be present at the consummation.

The statute of March 1st, 1788, (2 Greenleaf, 116, sess. 11, ch. 48, s. 2,)
declared that no permit should be granted to retail spirituous liquor, unless
three commissioners, (a full board,) should be *present at the granting thereof.*
This provision came under consideration in *Palmer q. t.* v. *Doney,* (2 John.
Cas. 346,) which was an action for debt for several penalties alleged to be
incurred by the defendant under the 10th section of the act, for selling with-
out a permit. The main question was, whether the permit was granted by
a competent board. The supervisor and two justices, (a full board,) being
met, the defendant applied to them for license. The supervisor decided
against granting it; whereupon the two justices retired into another room,
and gave the license required. In this case, it is evident from the language
of Lewis, C. J., who delivered the opinion of the court, that they considered
the statute as substantially satisfied in its equity and spirit; but they
yielded to its strong letter; expressly putting themselves on the positive *pro-
viso,* that three commissioners *should be present.* This is a case which stands
almost alone in our statute book; and is evidently founded on the extreme

*In our view, this is a plain case of valid appraisal. The interests of the state were represented on the motion by the jealousy of the legislature against the heedless multiplication of taverns. The provision is continued to this day, with the addition, that the supervisor of the town shall be one of the three who shall be present; and that unless they are all actually present, the license shall be void. (1 R. L. 177, s. 3.)

The act of 1788 contained no provision that a majority of the three might act in any way. Yet there can be no doubt, that had a majority come to a proper determination as in the principal case, the license would have been sustained. It is stated as a difficulty by Lewis, C. J., that if it did not appear that *even a majority, when the three were together, granted, or even agreed to grant a license.* Had they *so granted, or agreed to grant,* can there be a doubt that the court would have held the act valid? It may then be taken as holden, even at that early stage of our judicial history, that a majority of any public body, having judicial powers, may bind the minority. This doctrine practically pervades our whole system, from the humble court of special sessions, convened to try a petit larceny, to the high court for the trial of impeachments and the correction of errors. By the 5th article of the constitution, the president of the senate, the senators, the chancellor, and the justices of the supreme court, or *the major part of them,* shall constitute the court of dernier resort. The constitution did not deem it necessary to say that when the *major part* who constitute that court are convened, a *majority* may bind the minority by a valid judgment or decree; nor is there any statute to this effect. Yet such has been the uniform practice; nor was its propriety ever questioned. True, this is comparing great things with small: but the same common law principle applies to every judicial body. It has been applied even in the petty corporations and *quasi* corporations of *England,* many of which partake so little of a public nature, that their very existence will not be judicially noticed. Thus, in the case of *Wadham college,* (Cowp. 377,) the statute was against the *warden's* affixing the corporate seal in any case, without the consent of himself and a majority of the fellows. He being thus, by *name,* associated with a majority of the fellows, he insisted that he had a negative upon them. But the court of K. B. held that he made but one with the majority of the fellows, who, with him, constituted the body that should act, and a majority of such body, having voted that he should affix the seal to an answer in chancery, they compelled him to do so by mandamus, though contrary to his own vote and consent. In *Rex* v. *Beeston,* (3 T. R. 592,) the case was, that a statute had authorized the *church-wardens and overseers of the poor,* to make certain contracts. They had all, with the exception of the defendant, (one of the overseers,) who refused to join, made a contract, and the money was in the defendant's hands to be paid upon it. On a motion for mandamus to compel him to pay, he insisted that he was not bound, inasmuch as the statute required the contract to be made by the *church-wardens and overseers,* without saying, *or a majority.* They should, therefore, all concur; and he having dissented, the contract was void; and he was, therefore, not bound to pay the money. But the motion was granted. Ld. Kenyon, C. J., recognises the same ground afterwards taken by the supreme court in

*attorney general, after full notice to the canal commis-
sioner who raises this question.   The facts are not disputed ;

*Palmer, q. t.* v. *Doney,* (*supra.*) that the defendant's construction must prevail, had the legislature *expressly* required it. But they had not. He says, "in common understanding, what is required to be done by the *church-wardens and overseers,* is satisfied by being done by a majority." In *Withnell* v. *Gartham,* (6 T. R. 388,) power was given to the *vicar and church-wardens* to appoint a schoolmaster to an ancient foundation. And the only question was, whether all the church-wardens must concur with the vicar. *Held,* that the concurrence of a majority was sufficient. Lawrence, J., remarked, "In general, it would be the understanding of a plain man, that where a body of persons is to do an act, a majority of that body would bind the rest." *Grindley and another* v. *Barker and others,* (1 B. & P. 229,) is in point. A statute had authorized the summary trial and condemnation of leather coming into the market, by 6 commissioners under the appointment of the mayor of London. Certain leather of the plaintiff's was tried by the 6, when 4 only, without the concurrence, and in opposition to the other two, condemned the leather, which was thereupon seized pursuant to the statute. The owners brought trespass, and the question whether the condemnation by the majority bound the plaintiff, was directly presented, and *held* that it did. Eyre, C. J., said, "If it is the mere finding of the 4 who concurrred, then this leather is not found insufficient; but if the operation of the law on the finding of the 4, who are the majority of the body duly assembled, be, that their judgment is the judgment of the whole, and therefore, the judgment of the triers, then the leather must be taken to be insufficient, and the defendants are justified." In a very able and conclusive argument drawn from authority, he maintains the latter. All the judges, *seriatim,* deliver their opinions to the same effect, and maintain them by ancient and modern authority. Buller, J., says the authorities are all that way; and that not a single case nor dictum had been quoted on the other side of the question. Rooke, J., says, " We shall not advance public justice by saying, that though a majority of the triers, who have had the advantage of all the information to be derived from the whole 6 who compose the tribunal, are of opinion that the leather is unserviceable, still any one man shall have it in his power to prevent a finding, by holding out against the rest. All 6 must undoubtedly try; but it does not, therefore, follow, that they must all decide the same way. Each man is, after due examination and inquiry, to decide according to the best of his judgment; and the question is to be determined by the opinion of the majority." Heath, J., said, " We know very well that in all commissions of oyer and terminer, and jail delivery, and of the peace, where a quorum is constituted, and it is necessary that a quorum should be present to do the acts for which they are appointed; yet if the quorum are in the minority, the majority shall conclude the minority."

A singular strictness seems finally to be established in England, with regard to certain corporate acts, somewhat similar to that required by the statute in regard to the manner of granting tavern licenses, considered above. Many corporations aggregate, there, as in this country, consist of several

*and we see no reason for going through with the forms of an alternative mandamus, which we are confident must

distinct parts, which are called *integral parts;* as of a mayor, aldermen and commonalty. Neither of them have any political capacity distinct from the two; (1 Kyd on Corp. 36;) and it was held in *The King* v. *Pasmore*, (3 T R. 199,) that if any one of these parts be vacant of members, or, being of a definite number, if a majority of that number cease to exist, and there is no corporate means of supplying their places, the corporation is dissolved; and the king may grant a new charter. The same doctrine was repeated in *The King* v. *Bellringer*, (4 T. R. 810,) and *The King* v. *Miller*, (6 T. R. 268, 278, per Ld. Kenyon, C. J.) In the latter case, this class of corporations were looked upon, as no doubt they really are, a sort of *imperium in imperio*, shaped upon the government of the country; and that hence, in the performance of corporate acts, required to be done by certain integral parts, as by the mayor and aldermen, one part could not even consummate any act without the presence of the other; the concurrence of both branches of this local legislature being so far necessary. Yet, in several cases, (indeed, this is usually so; *The King* v. *Bower*, 1 B. & C. 492,) the requisite parts being present, they constitute one body, each individual having but a *single* vote; the *integral part* composed of the lesser number being, in this way, within the power of the more numerous, for want of an *absolute veto*. Thus, in such a case of mayor and aldermen, when all are assembled, the vote of the mayor, one of the *integral parts*, weighs no more than that of a single alderman, the member of a numerous body. But the law being very strict, in requiring the actual presence of all the *integral parts*, there have been several instances of a mayor's deserting his post, after business begun, when he saw a corporate act going against him. The first attempt of this kind failed. It was in *The King* v. *Norris*, (1 Barnard. K. B. 385.) The *presence* of the mayor of Newcastle was necessary in all corporate assemblies. At one of these, as soon as the lists of certain persons were given in as candidates for freemen, and before they were admitted to their freedom, the mayor dissolved the assembly, who, notwithstanding, proceeded to admit them. On a rule to show cause against a mandamus, commanding the mayor to swear in the persons admitted, it was made absolute; the court saying, "it is very true, that no new business can be proposed in the absence of such officer; but the assembly has always the right to proceed in the business begun when he was present." The *second* attempt was more successful. In *The King* v. *Buller and another*, (8 East, 388,) it appeared by the charter, that the mayor, aldermen and burgesses of the borough of Saltash in Cornwall, or the major part of them, were, on the charter day, to assemble in the Guildhall; when the mayor and aldermen, or the major part of them, were to nominate, and put in election for mayor, two of the aldermen; and there to *continue together*, or in due manner adjourn, until the mayor, aldermen and burgesses, or the major part of them, &c., should have elected one of the two aldermen nominated, for a year. Being thus convened, pursuant to a mandamus, Buller, the mayor, and two aldermen, nominated the two latter for mayor; but the other aldermen, a *majority*, nominating two out of their number, the mayor

result in the same view that we now take of the case. We, therefore, order a peremptory mandamus, commanding the canal commissioners to pay the amount of damages as assessed.

ALBANY,<br>Oct. 1827.<br>The Peo<sub></sub>  <br>v.<br>Ekfc·ʟ

Rule for a peremptory mandamus.

and his two nominees quitted the Guildhall. The other aldermen, with the burgesses, proceeded to an election of those nominated by the four. On a rule to show cause, against Buller, the mayor, why a mandamus should not issue, commanding him to swear his successor into office, the case of *The King* v. *Norris*, (*supra*,) was, at first, overlooked. On examination, afterwards, its authority appeared to the court somewhat questionable; and the election passed as irregular, for want of the *actual presence* of the *old mayor*. (Vide 8 East, 392, note (*a*).) The court put their decision on the ground that the *mayor* was an *integral part* of the corporation.

This strict notion seems finally established in England, by *The King* v. *Williams*, (2 M. & S. 141.) The mayor, burgesses and commonalty of the borough of Carmarthen, were to elect a mayor, annually. They being assembled at a quarter before one, P. M., the mayor, contrary to the advice of the recorder, and the sense of the burgesses, proposed to adjourn till three, P. M. He did not do so, however, and, in his presence, one E. was suddenly proposed and seconded as a candidate, before the mayor left the place; but he departed before E. was declared duly elected, though this was done, immediately after his departure, by the burgesses and commonalty. The K. B. held that the election was void for the absence of the presiding officer, an *integral part* of the corporation. Dampier, J., relied on *The King* v. *Buller*, (*supra*.)

---

*THE PEOPLE *against* ECKFORD, Swift, Rathbone, Vermil-*  [*535]
*yea, Brown, Spencer, Davis and BARKER.*

THE indictment in this cause, which was for conspiracy, having been removed into this court by certiorari from the

An indict-<br>ment for a con-<br>spiracy to de-<br>fraud individu-

als of private property, must set forth the means agreed upon by the conspirators. Vide this case in connection with *Lambert* v. *The People*, 7 Cowen, 166.

It is in the discretion of the court to quash an indictment for insufficiency, or put the party to a motion in arrest; and where the question is doubtful, they will put him to the latter. Otherwise where it is clear.

As where the question is settled by the court of errors in another cause.

Manner in which the court will inform themselves as to the ground of decision in the court of errors.

Quashing an indictment as to one of several defendants, quashes it as to all.