REPUBLIC OF COLOMBIA v. CAUCA CO. et al.

(Circuit Court, D. West Virginia. January 9, 1901.)

**1.** JURISDICTION OF FEDERAL COURTS—SUITS BY FOREIGN STATE.

A suit in equity to set aside an award of arbitrators may be maintained in a court of the United States by a foreign state against a corporation of the state in which the suit is brought, found and served within the district.

**2.** ARBITRATION AND AWARD—CONSTRUCTION OF AGREEMENT OF SUBMISSION—MAJORITY AWARD.

The government of the republic of Colombia granted a concession to a citizen of the United States to construct and operate a railroad in that country, and such concession was, with the consent of the government, assigned to a corporation of West Virginia, which proceeded to construct and equip a portion of the road. A controversy having arisen, the government sought to revoke the concession, and the matter became a subject of diplomatic correspondence between the Colombian government and the state department of the United States. The Colombian congress subsequently passed an act authorizing the government to enter into an agreement with the company for an equitable adjustment of the differences between them, conditioned upon the surrender by the company of its concession, and the delivery of all its road and property to the government. In accordance with such act, an agreement for settlement and arbitration was entered into, by which the company surrendered its franchises and property on receipt of a cash payment of $200,000, and a commission was created, composed of three members; one appointed by each of the parties, and the third selected by the secretary of state of the United States and the Colombian minister at Washington, acting jointly. The commission was given power to regulate its own procedure, and was required to determine the amount of just indemnity to which the company was entitled for the works and labors executed during the time the enterprise had been in its charge, its award to be final. The commission was given extensive powers, to inspect the property, take testimony, and examine all the books and records of the company. Held, that under such circumstances, the matter being in the nature of a public controversy, and the commission having been appointed in pursuance of a public law, for the expressed purpose of making an equitable adjustment of the matters in dispute, and in view of the manner of selection of the third member, the articles of submission could not be construed, in the absence of an express provision therefor, to require a unanimous decision in order to render the award valid, but that, the commission having unanimously agreed that all matters should be determined by a majority vote, an award so made, upon matters heard and considered by the entire commission, was binding on the parties.

**3.** SAME—VALIDITY OF AWARD—ATTEMPTED RESIGNATION OF ARBITRATOR.

The final sessions of the commission were held in New York. After all the testimony had been taken, and all the matters in controversy had been argued by the parties and considered by the commission, and a final vote thereon was about to be taken, and after a number of the items of the award had been agreed upon, some unanimously and some by a majority vote, the member of the commission appointed by the Colombian government wrote a letter to his government resigning his position. He delivered a copy of such letter to his colleagues, and refused to take any further part in the proceedings. There was not sufficient time remaining before the award was required to be made by the articles of submission to permit of the vacancy being filled in the manner therein provided. Held, that such resignation, which was not in fact shown to have ever been forwarded to, or accepted by, his government, did not of itself create a vacancy, and would not be given effect to terminate the existence of the commission, and render nugatory its award, made on the same day, by the concurring votes of the other members.

106 F.—22

**4. SAME—SCOPE OF SUBMISSION.**

The scope of the submission, as to the matters to be considered and included in the award, was a matter to be determined by the arbitrators, and the presumption is in favor of the correctness of their determination; to impeach their award, it must be clearly shown that they exceeded the powers granted.

**5. SAME—CONSTRUCTION OF ARTICLES OF SUBMISSION—MEANING OF FOREIGN WORDS.**

Where articles of submission to arbitration are in a foreign language, and contain technical terms, the arbitrators may properly receive expert testimony as to the meaning of such terms when translated.

**6. SAME—SCOPE OF SUBMISSION.**

The articles of submission provided that the company should receive a "just indemnity" for the works and labors connected with the railway enterprise, to be determined by the commission, and it was given authority to examine the books and accounts of the company, and all documents which might be submitted by the parties, and also to appraise the structures, works, and materials. Prior to such agreement, the company had refused to settle on the basis of the actual cost of the physical construction of the road, and the government had offered in settlement a sum considerably in excess of such valuation as subsequently made by the commission, and as to which there was no controversy. *Held*, that the articles of submission, agreed to under such circumstances, in the absence of express provision to the contrary, must be construed to authorize the commission to take into consideration, in determining the just indemnity to be awarded the company, the other outlays made by it in the prosecution of the enterprise, in addition to the cost of the physical structures delivered to the government, such as the salaries paid its officers, its office and traveling expenses, and the amount paid by it to the original grantee for the concession, and that an award covering such items should not be set aside in the absence of any evidence to impeach the good faith of the commissioners.

**7. SAME—ALLOWANCE OF INTEREST.**

The articles, however, having made no provision for the allowance of interest, and the company having been in possession of the road and receiving its revenues up to the time of the settlement, the allowance of interest on any of the expenditures made by the company was not within the scope of the submission; but the erroneous allowance of such interest did not vitiate the award as a whole, the items being separately specified, so as to be readily separable.

**8. SAME—ALLOWANCE OF COSTS—ATTORNEY'S FEES.**

A provision in the articles of submission for payment of the expenses of the commission, and authorizing a finding by the award whether they should be paid by one or both the parties, did not authorize the commission to allow a fee to the attorney for the company as costs, and direct its payment by the other party.

In Equity.

Calderon Carlisle, Wm. G. Johnson, and Edwin Maxwell, for complainant.

Cowen, Cross & Bond, Edward H. Murphy, and John W. Beaumont, for defendants.

GOFF, Circuit Judge. This is a suit in equity instituted by the republic of Colombia against the Cauca Company and the Colombian Construction & Improvement Company, two corporations organized under the laws of the state of West Virginia. The purpose of the bill is to obtain a decree directing the cancellation of an award made by two of three arbitrators, acting under a certain agreement of arbitration dated January 4, 1897, between the complainant and the Cauca Company, one of the defendants, the object of which was to

obtain a settlement of all the differences then existing between the republic of Colombia and the Cauca Company in connection with the contract for the construction of the Cauca Railway. The award was returned October 22, 1897, signed by two of the three arbitrators named in the submission, and was in favor of the Cauca Company for the sum of $452,048.93 in gold coin of the United States, to be paid by the complainant to the Cauca Company on January 26, 1898, in addition to the sum of $200,000 previously paid on account. The complainant insists that the award is invalid because it was made by two of the three arbitrators; because it comprehends the allowance of items which were never considered, at any time, by all three of the members of the commission acting together; because the arbitrators acted in excess of their powers, in that they considered and made their award as to matters not committed to their judgment by the articles of submission; for other reasons alleged in the bill, but not relied on in the argument, and consequently they will not be specially referred to.

The defendants duly filed their answer to said bill, to which exceptions, on account of impertinence, were taken and disposed of. A cross bill was tendered by defendants, and filed by leave of court, praying for a discovery as to certain matters referred to in the original bill, as well as to transactions connected with the agreement of submission, and the proceedings of the commission at its sessions held thereunder, and also for a decree for specific performance by the republic of Colombia of the agreement of January 4, 1897, and for the payment of the award before mentioned; and that the said republic of Colombia be required to designate an attorney in fact within the jurisdiction of this court, with authority to accept service of such process or orders as may be found necessary for the exercise of the jurisdiction of the court. The cross bill was answered, issue joined, testimony taken, and the case regularly submitted after argument by counsel. The record is most voluminous, the pleadings, exhibits, and testimony making several large printed volumes, and it would be a discourtesy, of which this court will not be guilty, if mention were not made of the fact that the briefs of counsel and their oral arguments, while able and eloquent, by far exceed the record in size as well as in interest. I have given the testimony careful study, for the decision of the case depends more on the proper finding of the facts than on the determination of the law. The former is not easy of solution,—may be involved in doubt,—but the propositions of law to be disposed of and applied are, I think, well established,—even elementary in character.

First, the question of jurisdiction is to be disposed of. The republic of Colombia is a foreign state, within the meaning of those words as used in the constitution of the United States, and as such it has the right to maintain a suit in this court, against any party found within this district, concerning any subject-matter of which this court has jurisdiction. The Sapphire, 11 Wall. 164, 20 L. Ed. 127. The defendants were found and served with process within the jurisdiction of this court. They have appeared and answered, and they have filed their cross bill, which has been answered by

the sole defendant thereto, the complainant in the original bill. That courts of equity have jurisdiction of bills the object of which is to set aside awards, and decree the same to be void, is too well settled by numerous decisions to admit of doubt. 2 Story, Eq. Jur. §§ 1451, 1462; 2 Pom. Eq. Jur. § 919; Burchell v. Marsh, 17 How. 349, 15 L. Ed. 96.

Before proceeding to consider the validity of the award, it will be well to state the facts relating to the controversy for the settlement of which the arbitration was entered into:

On August 27, 1890, James L. Cherry, a citizen of the United States, entered into a written contract with the complainant to construct and operate a steam railway in Colombia, between Buenaventura, on the Pacific Coast, and Manizales, by way of Cali. This line of railway was to be constructed and open to traffic, as far as the city of Cali, within four years from the date of said contract, unless prevented by fortuitous circumstances or vis major. This contract was approved by the congress of Colombia by an act known as Law 16 of 1890. Upon that part of the road to be completed within four years complainant guarantied interest to Cherry on the basis of 5 per cent. per annum, for 18 years, on the sum of $38,000 American gold for each kilometre. A portion of the line had been built previous to this contract with Cherry, which was by it assigned to him, together with the rolling stock thereon and the buildings relating thereto. Upon this portion of the road the guarantied interest of 5 per cent. was to be paid on the basis of $8,000 per kilometre. This interest was secured to Cherry by one-half of the gross revenues of the Colombian custom houses on the Pacific Coast. The term of the concession was 70 years, at the end of which period the railway was to become the property of the republic of Colombia. As security on his part, Cherry was to deposit in New York, with complainant's depositary, $50,000 in American gold, before October 27, 1890, which was to be returned to him when a portion of the road equal in value to $200,000 was constructed. Complainant was to furnish military protection to the employés and the property of Cherry without cost to him, and he was given the right to use wood, stone, and other material from the government lands required for railroad construction. He had the right to assign the contract to any individual or company of a private nature, but not to any government or foreign nation, but notice of such assignment was to be given to the republic of Colombia. Troops, employés, and material of the government were to be carried over the railway at half rates. Cherry was to have his domicile in any city in Europe or America selected by him for that purpose, but, if he should not select Bogota, he was to keep in that city an agent vested with authority to deal with the government concerning all matters relating to said contract. It was further provided that, if for any reason the government should declare the concession to be forfeited, Cherry should have the right to submit the matter to the decision of two experts, one to be appointed by the government and the other by Cherry, and such experts were to appoint an umpire in the case of disagreement, and the decision of the arbitrators or of the umpire

was to be final and unappealable. On November 29, 1890, Cherry assigned his interest in the contract to the two defendants, the Cauca Company, which was organized to operate the road, and the Colombian Construction & Improvement Company, organized to construct it. The complainant was notified of the assignment, and thereafter recognized the Cauca Company as such assignee.

The defendant the Cauca Company began the construction of the road in due time. It purchased rails, locomotives, supplies, and other necessary material for the construction and operation of the railway. The work progressed, but was not completed within the four years stipulated for in the contract. The complainant insisted that the failure to complete was because of the default and mismanagement of the defendant the Cauca Company, while said company claimed that it was because of the improper conduct of the government of the republic of Colombia, and also because of vis major. On the 10th of December, 1892, the minister of public works of Colombia and the attorney of the Cauca Railroad Company entered into a written agreement by which the time for the completion of the first section of the road was extended for two years. On the 16th of November, 1894, the Colombian congress passed an act the first section of which reads as follows:

"The government will proceed to decree lapsed the contract of 27 of August, 1890, referring to the construction of the railroad from Buenaventura to Manizales, in as much as congress does not approve of the contract 98 of 1892, carried out between the minister of public works and Mr. Victor Mallarino, general representative of the Cauca Railroad Company, which deals with the extension of time for the construction of the said railroad."

This act also authorized the complainant to assume possession of the road and to continue its construction. The defendant the Cauca Company, as a matter of fact, still continued in possession of the part of the road that was completed, and proceeded with the construction of other portions thereof. Said company, protesting to the complainant as to the act of forfeiture mentioned, demanded the formation of a tribunal of arbitration, as provided for in the original contract. Several efforts were made by the parties to adjust the difficulties so existing, but without success, when the matter was brought to the attention of the secretary of state of the United States, who in May, 1895, advised the minister representing the United States at the capital of the republic of Colombia that the action of said republic in regard to the forfeiture of the concession held by the Cauca Company appeared to be a cause for diplomatic interference, and directed him to so inform the complainant. In October, 1895, the republic of Colombia directed that Cherry should appear at Bogota within 30 days, for the purpose of proceeding with the arbitration, and advised that, in default of his so doing, all rights claimed by defendants under the contract would be forfeited. The secretary of state of the United States again communicated with the minister of that government, residing in the republic of Colombia, instructing him, in substance, to render assistance to the defendants in the negotiations relating to said difficulties, and to obtain an extension of 30 days in order that Cherry, who was then

in the United States, might be able to reach Bogota: This exten-, sion was asked for by said minister, and was granted by complain-ant. In December, 1895, Mr. Cherry and Mr. Schramme, as rep- resentatives of the Cauca Company, arrived in Bogota, and pro-ceeded with the negotiations looking to a settlement of the contro-versy, the complainant being represented by its executive and other officers. No result was reached, and the subject was postponed until such time as the congress of the republic of Colombia could convene and consider the matter, each party in the meantime to re-tain such rights as they held under the original contract. The con-gress of the republic of Colombia convened and passed, on October 20, 1896, Law 41, authorizing the government to enter into an agree-ment with the Cauca Company having in view the equitable adjust-ment of the then existing troubles. This act contained, among other provisions, the following: "In any event, the condition of the friendly settlement shall be the renunciation on the part of the gran-tee or his representative of the franchise granted, and the conse-quent and immediate delivery of the railroad, and all its fixed and rolling stock, buildings, tools, and other appurtenances." Various propositions and counter propositions of adjustment were offered, but no conclusion was reached, and finally, on January 4, 1897, the agree-ment was entered into under which the award mentioned was made.

In article 1 of the submission, complainant and the Cauca Com-pany compromise and settle all pending differences in connection with the contract approved by Law 16 of the year 1890, regarding the construction of the railway mentioned.

In article 2 the company surrenders absolutely the concession, and agrees to deliver to complainant within 15 days the railway, plant, and rolling stock. In exchange complainant agrees to pay the Cauca Company a "just indemnity for the works and labors which the company may have executed during the time in which the enter-prise has been in its charge," and also to pay for rolling stock, etc.

In article 3 the parties agreed that the indemnity should be a sum equal to what "the company shall prove to have expended on the labors and works executed by it in the construction of the rail-way."

In article 4 provision was made for a special commission to fix the indemnity, to be composed of three members, one to be chosen by complainant, one by the Cauca Company, and the third by the sec-retary of state of the United States and complainant's minister at Washington, acting jointly.

In article 5 the commission was given authority to fix the in-demnity, and to appraise the structure, works, labors, and materials. In order to reach a proper indemnity, it was to examine the books and accounts of the company at New York, and the documents that complainant and the company might present in support of their claims, and such as the commission might demand. The commission was to inspect the railway, examine witnesses, appoint experts if necessary, and fix the time within which the parties might make their proofs. It was also to determine the procedure to be followed

in the exercise of the powers conferred upon it, including its own acts as well as the procedure of the parties themselves.

In article 6 it was set forth that if either of the commissioners resigned or declined, or should for any reason cease to act, the proceedings of the commission should not thereby be invalidated, but the vacancy was to be filled by a new appointment, to be made within 30 days, by the party whose commissioner failed to act. If such party failed to so appoint, then it was provided that the secretary of state of the United States and the complainant's minister at Washington, acting together, should fill the vacancy.

In article 7 the parties were authorized to appear before the commission either in person, by attorney in fact, or by agents.

In article 8 the time allowed for the commission to make and file its award was fixed at 150 days, counting from its first meeting, but an extension of 60 days was provided for in case of justifiable delay.

In article 9 it was agreed that the award should be final and without appeal.

In article 10 it was stated that the complainant, calculating that the company had invested about $200,000 in the construction of the railway (the company claiming much more), pays in advance to the company $200,000 in gold, on account of the indemnity to be thereafter awarded by the commission; this being done so as to secure the immediate possession of the railroad by complainant. It was also stated that, in case of an award for more than $200,000, the complainant was to pay the excess in such manner as should be determined by the commission.

In article 11 provision was made for turning the railway and property over to such person as may be designated by complainant, and for the taking of an invoice that should clearly set forth the condition of everything delivered.

In article 12 the expenses of the commission are provided for, and directions are given that the award shall find whether one or both parties shall pay the same.

In article 13 the discharge and release of the parties was provided for upon performance of the arbitration, and the extinguishment of the original concession was arranged for.

In article 14 it was agreed that the parties to the submission should select their commissioners within eight days after the ratification of the agreement.

In article 15 provision was made for the ratification of the submission by the vice president of the republic of Colombia.

Under this agreement the complainant appointed Manuel H. Pena and the Cauca Company Christian F. Schramme as their respective commissioners, and the secretary of state of the United States and complainant's minister at Washington selected Lewis M. Haupt, a civil engineer, as the third commissioner. On the 3d day of April, 1897, the commission so constituted met in the city of New York, duly organized, and chose as their chairman the said Lewis M. Haupt. The complainant was represented before the commission by Francisco J. Cisneros as attorney, and Roderick Robertson as coun-

sel, while the Cauca Company had as attorney Marcus Stine. The commission decided at its second meeting, held April 27, 1897, that all of its decisions should be by a majority vote of the members, and at its third session it was resolved that, in case of disagreement between the members of the commission, the chairman should decide the question at issue. The sessions of the commission were duly held at stated times, much testimony was taken, and many witnesses examined, a number of them being expert Spanish lawyers and literary men, as to the true meaning of the words relating to the scope of the commission and the extent of the submission. The books of the Cauca Company were offered, explained, referred to experts for examination and report, and subsequently considered by the commission. During the twenty-seventh session, held on August 30, 1897, the commission, finding that it could not complete its work within the limit of 150 days, unanimously resolved to extend the time for 60 days additional. At its thirtieth session, held on October 12, 1897, the commission commenced the consideration of the testimony,—oral arguments and briefs of counsel having been made and filed,—for the purpose of formulating its award. An allowance of $233,909.14 was made by the commission unanimously as the cost of the physical construction of the road; the sum of $108,181.42 was awarded by a vote of two to one as due on account of the salaries of the executive officers of the company to the 26th of January, 1897; the sum of $135,000 was awarded by a vote of two to one as the cost to the company of the original concession; the sum of $13,643.33 was allowed by a like vote as interest on the cost of concession; the sum of $29,385.88 was by a like vote allowed as traveling expenses of the officers of the company in connection with the business thereof; the sum of $29,200 was awarded by a like vote as reimbursement to the company for a portion of the extra compensation paid its officers for extra trips to Bogota; the amount of $16,605.10 was allowed on account of expenses of the company at its New York office; the sum of $5,122.48 was also allowed by a like vote on account of incidental expenses. At the meeting of the commission held on October 19, 1897, it was moved to award the company, as interest on the cost of physical construction to January 26, 1897, the sum of $48,668.18, and the questions relating thereto were discussed, but the vote thereon was postponed. At the same meeting a motion was made that the company be allowed the sum of $32,333.40 as the interest on the actual amount paid in by the bondholders of the company. That matter was fully discussed by the members of the commission, but no vote was taken, and further action thereon was postponed. This meeting was the thirty-fourth of the commission, and all the members of the same were present, as they had been at all previous meetings. All the members had heard the testimony and the arguments, and all had taken part in the discussions and deliberations relating thereto, as is disclosed by reading the 1,058 printed pages of their proceedings. The thirty-fifth session of the commission was held on October 22, 1897, at which meeting Mr. Pena, the member designated by the complainant, did not appear, but he caused to be presented to the commission at

its said session a communication dated October 22, 1897, of which the following is a copy of the translation thereof, the original having been written in the Spanish language:

"To His Excellency, the Minister of Hacienda, Bogota, Republic of Colombia: In view of the fact that Lewis M. Haupt and Christian F. Schramme, both appointed as members of the commission created pursuant to the convention of January 4, 1897, to decide the controversy between the Cauca Company and the republic of Colombia, relative to the Cauca Railway, have declared their intention to allow to the Cauca Company very large amounts of money for alleged expenditures of the company having no relation to either the construction expenses of the company or the purchase of material on the construction of said Cauca Railway or for use thereon; and whereas, the said commission has not, and never had, jurisdiction to pass upon or allow such expenditures; and whereas, in my judgment, said commissioners have departed from the terms of said convention, and propose to act in the matter of said controversy in a manner wholly beyond their official power as such commissioners, and to make an award upon matters which the parties to said controversy never intended to submit to their decision; and whereas, under the said circumstances, I am convinced that it is my solemn duty to refuse to act further with such commissioners, and to decline to remain a member of such commission until the illegal intentions of said commissioners shall have been carried out by the making on their part of a pretended award upon matters not submitted to said commission. I therefore beg to say that I hereby resign as a member of said commission, such resignation to take effect at the moment of my signature hereto.

"Dated at the city of New York, this 22d day of October, 1897."

This copy of the letter of resignation was inclosed in a communication from Mr. Pena to the secretary of the commission, and at the same time there was presented to said commission a letter, of which the following is a copy:

"New York, Oct. 22, 1897.

"Messrs. Lewis M. Haupt and Christian F. Schramme—Gentlemen: Being informed by Mr. Manuel H. Pena that he has resigned his office of commissioner in the matter of the arbitration of the controversy between the Cauca Company and the republic of Colombia. I desire, on behalf of said republic of Colombia, to say that such resignation on the part of Mr. Pena has destroyed the autonomy of the commission of which you and he were members. and that under such circumstances no further act can have any force or effect as an official act on behalf of such commission or as an official act of a commissioner in said matter.

"Yours. very faithfully,                                        F. J. Cisneros."

The following resolution was then passed by the votes of the remaining two commissioners, viz.:

"Whereas, by the terms of the convention pursuant to which this commission was created, it is provided in the eighth article thereof that 'in order to carry into execution the proceedings fixed by this agreement, and to render its decision, the commission shall meet in the place or places elected by it, and for such purposes shall have one hundred and fifty days, counting from the installation, which may be extended sixty days more in case justifiable grounds of delay shall arise'; and whereas, this commission met and organized on the 3d day of April, 1897, pursuant to the provisions of article fifteenth of said commission, and has since that time heard the proofs and allegations on behalf of the respective parties to the said convention, and has been attended by the attorneys and counsel for the respective parties, and has heard and considered their arguments, both oral and printed, and all of the members of this commission appointed by said convention having participated in all of the said meetings which have heretofore been held; and whereas, the time fixed by the said article eighth for the rendition of the decision of this commission has been extended in pursuance with the provisions of said article

eighth, and the said extended time will expire on the 31st day of October, 1897:
and whereas, all of the members of the said commission have deliberated with
respect to all of the matters submitted to it, and a conclusion was reached
by the members of this commission with respect to all of said matters prior
to this date, but such conclusion has not as yet been formally announced;
and whereas, the attempt on the part of Senor Manuel H. Pena to resign from
his position as a member of this commission, and his refusal to act as a
member thereof at this time and under the aforesaid circumstances, and the
concurrence in his action by the attorney for the republic of Colombia, indi
cate that it will be impracticable to procure the appointment of another com
missioner in place of said Pena, in the event that his attempted resignation is
of any effect, so as to enable this commission to render a decision within
the time required by the aforesaid eighth article; and whereas, by article
fifth of said convention it is provided that the said commission shall deter-
mine the procedure to be followed in the exercise of the powers conferred upon
it both as to its own acts as well as to the proceedings of the parties them
selves, and pursuant to said provisions it was unanimously determined by
this commission, with the concurrence of the attorney for the republic of
Colombia and of the attorney for the Cauca Company, that all decisions to be
rendered by this commission and all differences of opinion should be settled
by a majority vote, and that such decision should be final; and whereas, the
said commission is now ready to make its formal decision, the terms of which
were discussed between the various members of the said commission, includ-
ing the said Pena; and whereas, the said Pena has been requested to attend
at this meeting and to participate in the deliberations of the commission, and
has failed and refused to attend thereat: Resolved, that this commission
proceed forthwith to make its award and to formulate its decision as to the
matters involved in the said convention."

The following award was then made and announced:

"To the Republic of Colombia, the Honorable John Sherman, Secretary of
State of the United States, and the Cauca Company: The commission ap-
pointed under the convention of January 4, 1897, which convention was en-
tered into between the republic of Colombia and the Cauca Company, having
been duly organized on April 3. 1897, by all of the members appointed thereto.
to wit, Lewis M. Haupt, C. E., Manuel H. Pena, C. E., and Christian F.
Schramme, and having had numerous sessions thereafter, at all of which the
several members appointed to the said commission were present and partici-
pated in the proceedings taken before said commission; and the said commis-
sion and the aforesaid several members thereof having examined the books
of the Cauca Company with great care, and having heard all the witnesses pro-
duced by the republic of Colombia and the Cauca Company, respectively, and
having considered the arguments, both oral and written, and the various
documents submitted for the consideration of the said commission; and all of
the said commissioners having united in deliberating with respect to the mat-
ters submitted to it pursuant to the terms of the said convention; and the
undersigned, constituting a majority of the said commissioners, having reached
the conclusion that the Cauca Company is entitled to be awarded the sum of
four hundred and fifty-two thousand and forty-eight and $93/100$ dollars ($452,-
048.93) in gold coin of the United States of America in payment of its claim
against the republic of Colombia, which claim is the subject of the aforesaid
convention: Now, therefore, we, the undersigned commissioners, constitut-
ing a majority of the aforesaid commission, pursuant to the authority vested in
the said commission under the terms of the aforesaid convention, hereby find
that the Cauca Company is entitled to receive from the government of Colom-
bia, on account of the matters referred to in said convention, including the
moneys already paid by the republic of Colombia to the said Cauca Company,
the sum of six hundred and fifty-two thousand and forty-eight and $93/100$
dollars ($652,048.93), in gold coin of the United States of America, of which
sum the said republic of Colombia has heretofore paid the said Cauca Com-
pany the sum of two hundred thousand dollars ($200,000), leaving due and un-
paid to the Cauca Company the sum of four hundred and fifty-two thousand
and forty-eight and $93/100$ dollars ($452,048.93), in gold coin of the United

States of America, which sum we hereby award to the said Cauca Company, and which sum is to be paid by the republic of Colombia to the said Cauca Company in the city of New York on the 26th day of January, 1898. The republic of Colombia is also to pay, as a special allowance, as part of the costs incident to the said commission, to Attorney Marcus Stine, representing the Cauca Company, the sum of ten thousand dollars ($10,000) in gold coin of the United States, on the 26th day of January, 1898. In witness whereof, we have hereunto set our hands and seals this twenty-second day of October, in the year one thousand eight hundred and ninety-seven.

"Lewis M. Haupt, Chairman. [Seal.]
"C. F. Schramme. [Seal.]"

On the said 22d of October, 1897, after the award had been acknowledged before a notary public, the chairman declared an adjournment sine die. It is this award, made under the circumstances described, that the complainant prays may be decreed to be void.

Is the award defective because only signed by two of the three arbitrators? Was it the intention of the parties to the convention that there should be no award, and that the settlement should not be accomplished, unless all three of the commissioners agreed to and signed the finding? Was not the commissioner selected by the secretary of state of the United States and the minister resident of the republic of Colombia intended to be an umpire to cast the deciding vote, and determine all matters of difference between the commissioners selected by the parties to the convention? It seems to me that such was the intention. If it was otherwise, surely the language selected was peculiarly unfortunate. A unanimous decision was not required in express words, and in a case of this character it should not be implied. It was certainly the wish of the parties that the arbitration should be conclusive, effective, and final. The Cauca Company, in consideration of the submission, surrendered the railway and the property connected therewith to the republic of Colombia, and the latter, in order to secure such possession, paid $200,000 in cash, and agreed to pay such further sum as the commission should award; it being conceded that there should be no appeal from the result. The commissioners selected by the parties to the agreement were avowedly favorable to the contentions of those, respectively, designating them; but the third member, Mr. Haupt, was disinterested and impartial. Under such circumstances, unanimity of action was hardly possible, and could not reasonably have been expected. Such seems to have been the construction placed upon the agreement by the representatives of the parties thereto, for early in their sessions they concluded that a majority vote should govern their conclusions and determine the result of their labors. While, as a general rule, when submission is made to a given number of arbitrators, and no express authority is given that a smaller number may decide, an award will be void unless made by all, still there are exceptions, and if it can fairly be inferred from the manner of the submission, and all the circumstances attending it, that all were not required to join in the finding, the result will be sustained. In addition to the circumstances referred to, it was set forth in the agreement that the commission should determine the procedure to be followed in the exercise of the powers conferred upon it, both as to its own acts as well as to the proceed-

ings of the parties themselves. The commissioners determined that a majority vote should govern their proceedings, and all parties assented to this by their acquiescence through the frequent sessions of the commission, held during a period of over *200 days.* It follows that I reach the conclusion that the award of two of the commissioners was valid, it appearing that all three were present at all meetings of the commission when business was transacted, participating in its proceedings, and voting upon the motions and questions arising and decided, except the last one. Therefore, had Commissioner Pena not tendered his resignation, and had he been present at the session when the award was made, and then have entered his dissent, still, under the circumstances, the award would have been binding on the parties, unless some other good cause could have been shown to render it void. In addition to this, I think that the submission was in the nature of a public contention; that the compromise and adjustment of the same through the medium of the commissioners was based on a public law,—an act of the congress of the republic of Colombia; and that, therefore, under the well-established rule applicable to such controversies, the decision of the majority will conclude the minority, and their act will be the judgment of the whole number appointed. The dispute was, at least, brought to an issue by an act of the congress of the republic of Colombia, by which the franchise of the railway claimed by the Cauca Company was in effect forfeited. The submission was evidently the result of the friendly suggestions emanating from the secretary of state of the United States, and conveyed to the government of the republic of Colombia through the minister of the United States residing at Bogota. The third member of the commission was chosen, not by the parties nor by the commissioners appointed by them, but by the representatives of the governments of the republic of Colombia and of the United States. The original concession to Cherry recognized the enterprise he was authorized to carry out to be of public utility, and conceded to him all the rights usual under such circumstances. In such cases, unless there is a special provision to the contrary, unanimity in reaching a decision is not required of the commissioners. Co. Litt. 181a; Grindley v. Barker, 1 Bos. & P. 236; Ex parte Rogers, 7 Cow. 526.

But, as a matter of fact, was not Pena still a member of the commission when the award was made? Did the mere writing of a letter of resignation, which, so far as the record shows, was never even forwarded to the party by whom he had been appointed, cause a vacancy to exist in the commission? He could have recalled the resignation, or the party to whom it was directed could have declined to accept it, in which event he could again have taken his place as a member of the commission, and in fact he could have done that at any time after the writing of the letter, and before its acceptance by the power that appointed him. Clearly, it was not the intention of the parties to the convention that the existence of the commission should be destroyed by a resignation of the character of that presented by Commissioner Pena. It would be an impeachment of the common honesty of the parties to the agreement, and a travesty

on their evidently honorable intentions, to hold that they designed it should thus be in the power of one man—actuated by, to say the least, not commendable motives—to render worthless the work resulting from the expenditure of thousands of dollars and months of careful research, in an effort to amicably adjust an unfortunate controversy, that was rapidly reaching the point of embarrassment because of its national and diplomatic character. The testimony forces me to the conclusion that Commissioner Pena's only motive in withdrawing from the commission was to prevent, if possible, a conclusion from being reached, or to render the award invalid should one be made. This conduct—keeping in view all the circumstances surrounding him and the commission of which he was still a member—was not only reprehensible in character, but was fraudulent in its tendencies. He represented the complainant, as did Cisneros, who advised him to pursue the course he did, and, while I do not find that the complainant advised such action, still I hold that it would be unconscionable to allow the party whose agents thus deported themselves to effectuate, by the decree of a court of equity, the wrong intended to be accomplished by such improper conduct. If the award, which had virtually been agreed upon before Commissioner Pena withdrew, was composed of items not included in the submission, then he should have entered his dissent, and have relied on the proper tribunal, the assistance of which would have been easily obtained, for the purpose of declaring the invalidity of the finding.

This brings us to the consideration of the scope of the submission, and to the charge that the award includes items not contemplated by the convention. The presumption is in favor of the award, and to avoid it the party complaining must clearly show that the authority granted has been exceeded. The ambiguities in the submission were caused by the fact that certain words in it (in the Spanish language) were each susceptible of more than one meaning. Both parties to the agreement offered expert testimony as to the true meaning of said words, argument of counsel was heard, and the commission rendered a decision to the effect that the items included by it in the award were embraced in the terms of the submission. This question was one for the commission to decide, and, as the words in controversy were of a foreign tongue and had a technical meaning, the evidence of experts was properly taken. 1 Greenl. Ev. §§ 277, 280.

Did the commission err in the construction it gave to the submission, and did it deal with matters which the parties never agreed should be the subject of the award? In construing the submission, we must not only look at the agreement itself, but also at what was the obvious intention of the parties, as shown by the circumstances existing when the contract was entered into. The parties clearly intended to adjust all matters of controversy relating to the original concession to Cherry, as well as those growing out of the construction of the Cauca Railway. One side was claiming a sum of money largely exceeding $600,000, while the other was conceding the sum of $200,000, and offering to arbitrate as to any additional amount. The original concession contemplated its assignment to a foreign

company or individual, and the assignment by Cherry was of record in the proper office in Bogota, the consideration of which assignment is one of the items of the award complained of. The company surrendered the railroad, and property connected therewith, and was to have in exchange a just indemnity for the works and labors connected with the railway enterprise. The company had absolutely declined a settlement the basis of which was to be an expert valuation of the actual cost of the physical construction of the railway. The president of the republic of Colombia had offered to see that $400,000 was paid as a cash settlement of the controversy, and had assured the minister of the United States residing at Bogota that his desire was that the company should receive back every dollar it had expended. By the fifth article of the convention, the commission was authorized to fix the indemnity, and in addition it was to appraise the structures, works, and materials referred to. To "indemnify" is to save harmless; to reimburse; to repay any damage sustained. If the commission, in ascertaining the indemnity, had been limited to the actual local cost of the railway, why was it necessary to consider the books of the Cauca Company at New York, as also the documents that the government of Colombia as well as the Cauca Company might present in support of their respective claims, and such as the commission might demand? And would the president of the republic of Colombia have suggested, in settlement of the controversy, a sum in amount nearly double that of the actual expenditures for physical construction, about which there seems to have been but slight divergence of opinion, if that matter had been the only one in controversy? I think that the conclusion reached by the commission as to the general scope of its powers was correct, though on several items of one class of the allowances I am, as will appear hereafter, of the opinion it was in error.

The sum of $233,909.14 was allowed as the cost of physical construction, and as to this item there is no controversy. The amount of $108,181.42 was estimated as a proper allowance on account of the salaries of the officers of the company. This the complainant insists was improper, because not included in the submission. For the reasons already stated, I find that this objection is without merit. It was well known to the complainant at the date of the convention that Cherry had assigned his interest in the concession to the Cauca Company, and that said company, organized for the purpose, was then or had been actively engaged in the construction of the railroad. Such companies act only through their officers, usually men of experience and ability, whose services command a compensation in keeping with the character and magnitude of the work. That it was the intention of the parties to the convention that a portion of the indemnity should be on account of such expenses is clear, I think, from the submission itself, as well as from such facts existing at the time the agreement was signed as are proper to be considered as explanatory thereof. What that allowance should be was left for the commission to determine. All of the members heard the evidence and the argument, and two of them agreed to the allowance. Before this court can interfere and declare their findings invalid,

it must be shown by the evidence that they acted corruptly, or that they made a gross mistake, or the same must be apparent on the face of the award. I do not see the gross mistake, nor can I find that they or either of them were improperly influenced or governed by corrupt motives. This allowance may be large, is I think more than this court would have found from the evidence, but it is not so excessive or so outrageous as of itself to constitute conclusive evidence of fraud or corruption. The fact that the award is for a larger sum than the court would have allowed is not alone sufficient cause to justify a decree declaring the finding void. Such an allowance is one rather of discretion, based on all the circumstances proper to be considered, and not found on mere calculation. The parties to the convention left this matter to the honest judgment of the tribunal chosen by them, and this court should not annul the award returned, even if it should think it could have made a fairer one. Arbitrators are expected to base their decision on the real merits and justice of the controversy submitted to them, and are not required to follow the strict rules of law. The utmost good faith in the discharge of their duties will be presumed, and the result reached by them will not be disturbed without clear proof of either corruption, partiality, or misconduct.

The amount of $135,000 was included in the award as the cost of the concession. That Cherry necessarily made large expenditures in the negotiations preceding the execution of the original concession is apparent, and it is not strange that he provided in his assignment that he should not only be reimbursed the same, but also that he should be compensated for the valuable franchise he had secured. The complainant knew of his assignment of all his rights and privileges to the Cauca Company, and certainly it was not justified in presuming that the same was made without compensation. This item was within the submission, and I find nothing in the record of this case by which I can impeach the judgment of the commissioners.

The sum of $29,385.88 for traveling expenses, $29,200 on account of extra compensation, $16,605.10 for the expenses of the New York office, and $5,122.48 for incidental expenses were also allowed, after a careful examination of the books of the company, of the reports of the experts, of the evidence in general, and the arguments of counsel. The plaintiff furnishes the court with no evidence of fraud or corruption, nor of gross mistake, but virtually rests its contention quoad these matters on the insistence that they are not within the submission. As I have already, in substance, stated, I am of the opinion that this claim of complainant is without merit, and I find no evidence in this case that justifies me in declaring void the finding relating to said items.

Included in the award were the following sums, viz.: $13,643.33, interest on the sum allowed as the cost of the concession; $48,668.18, interest to January 26, 1897, on the stipulated cost of physical construction; and $32,333.40, as interest on the actual amount paid in by the bondholders. There was no direct authority given in the submission for the allowance of interest, nor can I find that it is to be inferred from the facts and circumstances attending the negotiations,

on which I have already fully commented. In fact, I infer to the contrary; for it appears that the company was in the actual possession of the railway and the property connected therewith, enjoying such revenues as it yielded, and at the same time receiving from the complainant an allowance in the nature of a subsidy. I do not find that it was the intention of the parties to the submission that the Cauca Company should be allowed both the use of the property and interest on the fund in constructing it. The indemnity was to be a sum which should be the equivalent of what the company should prove it had expended in connection with the works constructed by it. I have found that this was not intended to limit the award to the actual expenditures for physical construction, but it also included such incidental expenses as were necessary for the preparation and carrying on of the actual work in the field. But I am unable to concur in the conclusion that the submission justifies an allowance of interest on any of the expenditures, and therefore I hold that, so far as such allowances are concerned, the award is not binding. The items mentioned in the finding make, in the aggregate, the sum of $652,048.93, which is subject to a credit of $200,000, theretofore paid by the republic of Colombia to the Cauca Company, leaving the sum of $452,048.93, the amount of the actual award as returned by the commission. From this sum of $452,048.93 there must be deducted the items allowed by the commissioners under a mistaken conception of the scope of the submission, as follows: $13,643.33, as interest on the cost of the concession to the Cauca Company; $48,668.18, as interest on the cost of the physical construction of the railroad; and $32,333.40, as interest on the actual amount paid in by the bondholders,—making together the sum of $94,644.91, and leaving, as the actual and valid amount of the award, $357,404.02, in the gold coin of the United States of America, which the republic of Colombia is to pay to the Cauca Company.

An award is not always invalid because in some respects it exceeds the submission; for if the part which is in excess can be clearly separated from the remainder, which is within the submission, the latter should stand. In this case, the record of the proceedings of the convention, which is evidence before the court for all proper purposes, a duly-certified copy of the same having been made part of the complainant's bill, plainly sets forth each particular item of the award as returned by the commissioners, and therefore there is not the least difficulty in pointing out the matters not within the submission, all of which can be easily separated from the general finding.

In addition to the above award, the commissioners also directed that the republic of Colombia should pay to Marcus Stine, the attorney representing the Cauca Company, the sum of $10,000, a special allowance as part of the costs incident to the commission. This was not a proper allowance as costs, and it should not have been included in the finding made by the commissioners, and consequently will be disregarded.

I do not deem it essential to discuss the questions raised as to the relations existing between the Cauca Company and the Colombian Construction & Improvement Company, further than to say that it

is plainly shown that they were such as usually exist between railroads and their construction companies, and also that the conclusion is inevitable from the proceedings before the commissioners that the complainant was fully advised of such relations before the convention was signed, and evidently intended that all legitimate·expenditures of the said improvement company should be considered by the commission in ascertaining the indemnity it was to find for the Cauca Company.

The court, in reviewing the conduct and the award of the commissioners, must consider all the evidence laid before them by the parties to the convention, and it will regard as accurate the transcript of such proceedings found in complainant's bill, and admitted by the defendants to be correct. Other matters raised by the pleadings and discussed·by counsel are not deemed material, at least at this time, and will not now be considered. I will pass a decree drawn in accordance with the views herein expressed.